# EXHIBIT P

Document1

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION TRIBUNAL

| | |
|---|---|
| Dorothy Goldwasser, Romi Jones née Goldwasser, and Good Inventions, LLC<br><br>Claimants,<br><br>vs.<br><br>TiVo, Inc.,<br><br>Respondent. | Arbitration No. 13 117 Y 02109 11 |

**DISSENT FROM FINAL AWARD**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated March 12, 2004, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, DISSENT FROM THE AWARD, as follows:

Since the assumptions and logic of the award are flawed, and the Majority disregards the law to reach an unprecedented result beyond its remedial power, I dissent as set forth below.

**I.  Background: The Patent License Structure and Royalty Claim Thereunder**--The March 12, 2004 Patent License Agreement ("PLA") between the Parties structured a simple, straight forward arrangement. The relationship was struck in circumstances where the evidence reflects no other suitors for the Goldwasser patent despite years of effort attempting to license it. In the negotiations the Goldwassers were represented by a legal counsel nationally recognized as expert in the patent licensing field. The essential terms of the PLA were that with respect to what was left of the life of the patent (7 years), the Goldwassers would license it to TiVo subject to certain terms and conditions. In return, the Goldwassers were compensated with TiVo stock,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The stockholding allowed the Goldwassers the opportunity to participate in TiVo's future success. The structure of the agreement also provided for additional compensation in two specific instances, that were regarded as "win-win" scenarios: (i) where TiVo successfully licensed its DVR functionality (which included TiVo's intellectual property, such as the Barton and Goldwasser patents), there would be a sliding scale royalty payable to the Goldwassers; and (ii) if the Goldwasser patent was utilized (at TiVo's sole discretion) in litigation, then a substantial percentage of the recovery inured to the Goldwasser's benefit. The life of this arrangement ran until the Goldwasser patent expired, with specific provision for post-termination compensation expressly tied to entitlement arising during the pendency of the agreement. Neither of those scenarios occurred in connection with the Dish-EchoStar litigation settlement that precipitated the claim subject to these proceedings. Equally, it is undisputed that litigation was settled after expiration of the PLA and, further, that the settlement left open to the Goldwassers pursuit of an infringement claim against Dish-EchoStar.

The Goldwassers never claimed to be due a royalty – under Section 1 of PLA Attachment One or otherwise – based on the Dish EchoStar litigation until in or about June 2011 (See JO88). This was more than seven years after learning of the subject litigation; five years after the first of two litigation events they subsequently claimed created a payment obligation; approximately two years after the second event subsequently relied upon; approximately three years after the only action of finality to arise in the litigation in the form of a 104 million dollar damages and interest payment to TiVo by Dish Echostar, and only after expiration of the PLA. No claim of royalty entitlement was made on *any* basis by the Goldwassers during that lengthy period --despite the rapt attention the Goldwassers admittedly paid to that litigation (e.g. Todd Goldwasser's creation

of a Google alert to case developments); and the extent of contact and communication throughout between the Parties (See, e.g., J035.0; J035.1; J073; J074.0; J074.1; J053.0).

Yet, despite the express contractual terms and in these circumstances, a Majority of the Tribunal nevertheless finds an implied obligation of TiVo to pay a royalty to the Goldwassers based on the settlement, characterizing it as the "functional equivalent" of a license, which it concludes is required by the implied obligation of good faith and fair dealing to meet the reasonable expectations of the Goldwassers so as not to deprive them of the fruits of the contract. I disagree as follows.

**II.** **Analysis**: The Majority conjures up a new theory to replace the myriad changing claims asserted by Claimants over the course of the dispute, each of which failed to withstand scrutiny. In doing so, they adopt reasoning that is contrary to the positions advanced by the Goldwassers, to the express terms of the PLA, and which disregard applicable law. To explain:

**(1)** **The Settlement is not the "functional equivalent of a license for purposes of the PLA**--The lynchpin of the Majority's position is that TiVo's settlement is the "functional equivalent" of a license for purposes of determining the Goldwassers' rights under the PLA. The Majority buttresses this conclusion by noting that the court in the TiVo litigation with Dish Echostar invoked a hypothetical royalty analysis in awarding damages to TiVo. Both the conclusory assumption and the limited support invoked for it are flawed for several reasons.

First, the position is contrary to that taken by the Goldwassers in the arbitration, who expressly disclaimed to the Tribunal that the royalty entitlement claim relied on the settlement. (See, e.g., R046@1). The Goldwassers took this position in recognition that the settlement occurred *after* the PLA expired and, hence, as TiVo pointed out, could not "arise" during the

PLA; as such it would not meet the express survival provision of the PLA (paragraph 9.3). Thus, the Goldwassers abandoned the position they took at the outset of the dispute and initially in the arbitration that their royalty claim was based on the settlement. (J088@1 and J090 @ 5, 44 and 47-50). In this way they avoided a request for summary determination advanced by TiVo and were able to proceed to evidentiary hearing. The Majority nevertheless resurrects the position on its own as the basis for its award, despite estoppel of the Goldwassers from doing so.

Second, settlement of a patent infringement claim – here resolving TiVo's litigation with Dish Echostar based on *TiVo's* patent(s), but not including that of the Goldwassers – is not the functional equivalent of a license as a matter of law. The Majority cites no precedent to support its proposition, barely acknowledges (in one footnoted instance) and fails to meaningfully distinguish the authority placed before it that expressly contradicts the conclusion. In doing so, the Majority simply sidesteps with its implied obligation the entire body of patent law of infringement damages that presented an insurmountable obstacle to the result urged by Claimants. Yet the Majority's bald conclusion ignores the law that:

"Monies received as a settlement for past tortuous use of patents *are not the equivalent of royalties. Wang Labs, Inc. v. Oki Elec. Co.*, 15 F. Supp. 2d 166, 171 (D.Mass. 1998) (Emphasis added).

In reaching the opposite conclusion, the Majority disregards long established black letter law that royalties are received as a result of a license, and damages are received as a result of infringement, which is the antithesis of a license.

That result is not changed by the Majority's invocation of the utilization of a hypothetical royalty calculation in the award of damages by the court in the Dish Echostar litigation with

TiVo. Rather, federal statutory law requires it. Specifically, 35 U.S.C. §284 states that upon finding of infringement a court must award "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty of the use made of the invention by the infringers." Here the invention was TiVo's patent; not the Goldwasser patent. Here the Federal Court in the Dish EchoStar litigation found infringement and accepted a reasonable royalty calculation proffered through expert testimony to measure damages, just as it was federally compelled to do so. How the Majority can note that exercise and transform it into buttressing an otherwise completely unprecedented conclusion of functional equivalency is left unexplained. The Majority position disregards basic patent law. Simply stated, legally there was and is no such "functional equivalency" with a license, but rather only the bare minimum of damages per 35 U.S.C. 284. *Fromson v. Western Lithoplate & Supply Co.*, 853 F.2d1568, 1574 (Fed. Cir. 1988) *overruled on other grounds* 383 F.3d, 1337 (Fed. In 2004).

In contrast, not a single case was cited in this proceeding where a court has found that an award of damages for patent infringement based on a "reasonable royalty" theory was the "functional equivalent" of a license. Rather, the law clearly states: "[d]amages for infringement may sometimes be ascertained by reference to royalty of a measure of value for the unlawful use, but damages are not then transmitted into royalty." *Raytheon Mfg. Co. v. Radio Corp. of Am.*, 286 Mass. 84, 94 (Mass. 1934). As such, the employment of a reasonable royalty theory of damages, as a matter of law, provides *no* support for the Majority's conclusion of "functional equivalence". See, e.g., *Info. Res., Inc. v. Test Mktg. Corp., Inc.*, 22 F3d 1102 (Fed. Cir. 1993)("Although couched in terms of a 'reasonable royalty,' damages awarded under section 284 are designed to compensate a patentee for infringement of his patent rights, and **are not royalty payments at all.**")(Emphasis added.). The Majority's conclusion in this regard is not

only unprecedented and erroneous, it is achieved only by disregard of long established judicial precedent and federal statutory law.

**(2) The Majority's finding of an implied obligation as implicit in the agreement is improper** -- The Majority concludes that an implied obligation to pay royalties based on the settlement is implicit in the agreement, relying on the implied covenant of good faith and fair dealing to meet the reasonable expectations of the Goldwassers. This position is fatally flawed for a variety of reasons.

First, the Goldwassers never contended that TiVo breached its obligation of good faith and fair dealing in the PLA in *any* respect. The record is devoid of assertion by the Goldwassers or evidentiary indication whatsoever that TiVo in some shape, manner or form breached its duty of good faith and fair dealing in either the conduct of the Dish EchoStar litigation (by not asserting the Goldwasser patent), or in settling it when it did (after expiration of the PLA). Thus, the Majority rests its determination in this respect on a contention never vetted with the Parties or the subject of evidence.

Second, the Majority's reliance on the implied covenant of good faith and fair dealing here disregards applicable New York law in several respects. It has long been recognized and remains the rule that "the duties of good faith and fair dealing do not imply obligations 'inconsistent with other terms of the contractual relationship'...." *511 W. Corp v. Jennifer Realty*, 98 N.Y. 2d 144, 153(N.Y. 2002) *quoting Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983). Equally, then, the implied covenant can not serve to encompass a promise which the Goldwassers as "reasonable person[s] in the position of the promisee" were "justified in understanding was included." See id. Here while the Majority would treat the

settlement as functional equivalent to a license to trigger a royalty obligation, they simply ignore or disregard other inconsistent provisions of the PLA, including: limitation of the royalty obligation to the life of the Goldwasser patent; recognizing as surviving the termination of the PLA only those obligations which arose during the life of the agreement; only permitting the Goldwassers to share in litigation settlement proceeds when their patent is invoked in litigation (which here it indisputably was not). Further, the royalty payment obligation is expressly tied in the PLA to particular licensees and sublicensees, which the Majority fails to recognize expressly conditions royalty entitlement. Section 1 of Attachment One of the PLA requires payment of certain royalties as follows:

"Royalties. TiVo shall pay to the Goldwassers... royalties on behalf of TiVo and its **licensees and sublicensees** for...(a)... TV DVRs sold ... on or after January 1, 2004 through [March 12, 2011]."

Construing that payment term from the addendum is, under New York law, necessarily made in the context of the entire agreement. See, e.g., *Aivaliotis v. Continental Broker-Dealer Corp.*, 30 A.D. 3d 446 (S.Ct. App. Div. 2nd Dept. 2006). The reference to "licensee" and "sublicensees" originates in Section 2 of the PLA, which grants TiVo a license to the Goldwasser patent with an unconstrained right to sublicense. Section 15 of the PLA, in turn, refers to TiVo's right to license and sublicense "its rights under this Agreement." Since the only license conferred in the PLA (much less mentioned) is the Goldwasser patent, the only reasonable construction of "licensees and sublicensees" which conditions the Goldwasser royalty entitlement, is those entities licensed or sublicensed by TiVo under the Goldwasser patent. Here, in fashioning the implied royalty obligation by tying it to the settlement, the Majority ignores that the Goldwasser patent was not at issue in the Dish Echostar litigation; as such that condition to royalty

entitlement expressed in the PLA is read out of it, disregarding the black letter requirement of New York law that words and terms in a contract be given meaning. See, e.g., *Guggenheim Corp. Funding, LLC v. Access.1 Com. Corp.-NY*, 26 Misc. 3d 1210 (S. Ct. 2009)("Moreover, the court must avoid interpreting a contract so as to leave certain clauses meaningless.").

In addition, there was no testimonial basis in the hearing that would even support a finding of reasonable expectation by both Parties, much less the Goldwassers alone, as the Majority does in justifying the implied obligation supporting its award. Although the Goldwassers themselves testified to their *subjective* understanding of royalty entitlement in all circumstances (except a net litigation recovery as defined in the PLA), they did not participate in the negotiations with TiVo. Nor did they call as a witness their counsel who negotiated the PLA. As such, there was *no* competent testimony in the record that both parties expected or should reasonably have expected the Goldwassers to receive additional royalty compensation when they contributed nothing to a litigated matter, and their own rights were not prejudiced, used or implicated in any way. This hearsay testimony was not relevant evidence entitled under New York law to any weight to support a finding of mutual intent of the Parties in this regard. As such, the Majority disregards the New York law requirement to look at permitted parole evidence so as to derive the *objective* intent of the parties, *Milonas v. Pub. Emp't Relations Bd*, 648 N.Y.s.2d 779 (N.Y. App. Div. 1999); *Germaine v. Safeguard Ins. Co.*, 181 N.Y.S.2d 315, 316 (N.Y. App. Div. 1958).

Further, the only evidence of Party intent in this regard even mentioned in the Majority reasoning is their highlighting of a single sentence in attachment one to the PLA. However, the provision -- namely, "...the parties' intention that...TiVo...pay royalties once, whether from license revenue or litigation (but not more than once) per DVR unit" -- is referenced only in

isolation. By reading the term in isolation, rather than in complete contractual context as the law requires, the Majority thereby seeks to transform the term from words of limitation to words of entitlement. If read in context it is clear that the provision is merely tied to the two limited instances where additional compensation was negotiated and expressly provided for, and not as an overarching statement of an interpretative principle to be used to effectuate the overall contractual intent of the Parties, as the Majority seemingly must in order to first find the need for an implied promise and then to fill it.

Third, the Majority essentially advances a "gap" analysis *sub silentio* in order to fill a missing contract term obligating payment of millions of dollars in royalties in the circumstances permitted purportedly to serve the Parties' intent. New York courts instruct that gap filling is limited to *essential terms*; that is, terms as would render the contract indefinite. For example, a New York court refused to fill the gap of an omitted interest rate because "a default interest rate is not actually essential to make the agreement legally binding." *In re RMM Records & Video Corp.*, 372 B.R. 619, 621 at n.3 (Bankr. S.D.N.Y. 2007 (citing *Shann v. Dunk*, 84 F.3d 73, 79 (2d Cir. 1996)). Under New York law "[e]ssential terms are usually limited to price, quantity, and time." *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 523 (Bankr. E.D.N.Y. 1994) (citation omitted). Here, an essential term is not an issue, as the PLA is plainly enforceable and legally binding; rather mere application of the PLA terms to specific facts is at the heart of the Parties' dispute and the basis on which the Parties made their submissions.

In these circumstances, the New York "gap" rule simply does not allow a patent license to be rewritten even if the contract did not specifically address every possible factual scenario (although here the PLA does address litigation settlement as discussed below). The Majority's award fails to cite a single case from any jurisdiction that employs a gap-filling analysis in a

situation analogous to the present situation. The unprecedented inclusion of a gap-filling implied obligation is not appropriate in this case as a matter of New York law, which the Majority once again disregards.

Fourth, the Majority's approach also is advanced in disregard of additional applicable New York precedent. To explain, the Majority's implication of a royalty obligation to the Goldwassers ignores the familiar, sensible and axiomatic principle of New York law that contracts be interpreted practically "so as to give effect to the intention of the parties as expressed in the unequivocal language employed." *Breed v. Inc. Co. of N. Am.*, 46 N.Y. 2d 351, 355 (1978). Here, as in other cases under New York law, "... when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assoc. Inc. v. Ginncontieri*, 77 N.Y. 21 159, 1062 (N.Y. 1990). The Majority finds no ambiguity; yet, it nevertheless looks to extrinsic evidence and facts to find a gap (where the Parties saw none), which it then fills with an implied promise that, in turn, creates a multimillion dollar obligation where none was owed by the express provisions of the contract. In doing so, the Majority disregards the instruction of New York courts that: "[i]f the court may by an examination of the contract language alone discern a plain and distinct meaning, then the court should not resort to [gap-filling] but should enforce the legal relations as described by the meaning attributed to the contract." *Libra Bank Ltd. v. Banco Nacional De Costa Rica, S.A.*, 570 F. Supp. 870, 886 (S.D.N.Y. 1983). Because the PLA does address the litigation recovery scenario involving a settlement and precludes the Goldwassers' claim, there is simply no reason to resort to a "gap" analysis under New York law, especially since the Goldwassers have already been compensated with stock, which surely would appreciate in value given the infusion of a half billion dollar settlement with TiVo. So, the New York rule that controls and must be applied is

that "[a]s a matter of elemental fairness businesses should be allowed the benefit of their bargains and held to the performance of their obligations." VNO 100 West 33rd Street LLC v. Square One of Manhattan, Inc., 874 N.Y.SW.2d 683, 684 (N.Y. Civ. Ct. 2008). See also 72nd & First, Inc. v. Kraushar, 320 N.Y.S.2d 587, 591 (N.Y. Civ. Ct. 1971). Simply stated, the Majority chooses to rewrite the Parties' agreement, ignoring the instruction of New York courts not to do so. See, e.g., *Aivalotis*, supra, ("[A] court 'should not under the guise of contract interpretation, imply a term which the parties themselves failed to insert' or rewrite the contract.")(Citations omitted.).

The Majority's rewriting of the PLA also is based on an interpretation that produces an absurd commercial result in the circumstances, in further disregard of New York canons of interpretation. See, e.g., *Matter of Lipper Holdings, LLC v. Trident Holdings, LLC*, 1A.D. 3d 170 (App.Div. 1st Dept. 2003)("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.")(Citations omitted). The Majority's conclusion that the settlement is the functional equivalent of a license is advanced despite the uncontroverted facts that the Dish Echostar DVRs:

(1) contained no TiVo software;

(2) were not the subject of a claim that infringed on the Goldwasser patent;

(3) were not licensed or released under the Goldwasser patent; and

(4) were not licensed under any TiVo patents prior to expiration of the PLA.

Further, the Majority decision requires TiVo to pay the Goldwassers despite the fact that TiVo had no rights with respect to the Goldwasser patent at the time of the settlement (JO42 at 9), all

of which reverted to the Goldwassers such that they could still sue Dish Echostar for past infringement. In these circumstances the Goldwassers simply had no reasonable expectation of a royalty based share of a settlement, occurring as it did after expiration of their patent and the PLA and in circumstances where there has been no assertion, much less proof, of a lack of good faith and fair dealing with them by TiVo in connection with either the Dish Echostar litigation or settlement of it.

The result oriented justification for the Majority's implied obligation rationale is transparent from the two reasons relied upon and differs from the reasonable expectations of the Parties as reflected in express PLA terms. First, the Majority's express reliance on the absence of control over royalty entitlement in a litigation context is advanced despite the fact that it reflects the ***bargained for result of express contractual terms in the PLA***. Hence, the Majority substitutes its own conflicting concern as justification for its implied obligation despite the lack of any contention whatsoever that the control was ever abused by TiVo in fact. The Majority also cites the "win-win partnership" in which the Goldwassers would share in TiVo's growth by licensing or litigation as further justification. Yet, the Goldwassers already "won"; they were paid in stock under the PLA for the license regardless of whether the patent ever produced a dime in revenue. If it had enhanced value – because it was licensed DVR Functionality, then royalties were paid. If it had specific value in a litigation context for damages or settlement because of infringement in the absence of the license *and* in which their patent was asserted, they would be handsomely rewarded. If there was no use of their patent in a litigation context, but TiVo recovered damages or money through settlement, presumably that TiVo stock would reflect any increase in value attributable to a material judgment or settlement -- as here with Dish EchoStar involving half a billion dollars as previously noted. Yet, the Majority substitutes

its own sense of what is fair control and compensation in rewriting the PLA to provide contractually for a royalty despite the lack of reliance on or implication of the Goldwasser patent in the circumstances at issue. Thus, the Majority creates a multimillion dollar obligation found nowhere in the express terms of the PLA and justifies it for reasons that contradict its provisions in disregard of New York law.

Equally telling in regard to what were reasonable expectations -- as a matter of commercial reality and common sense -- is the fact that with respect to the millions of dollars actually received by TiVo from Dish EchoStar years before the litigation ended, the Claimants never made demand for any royalty entitlement under the PLA. That money – $87 million in damages and with interest totaling $104.6 million – was paid by Dish Echostar to TiVo in September, 2008; there was no appeal of that damages award for infringement of TiVo's patent(s). The judgment was final on that aspect of the claim and executed. The Goldwassers admittedly followed closely these developments. There was no surprise. Yet they did not put out their hand and claim any royalty on the proceeds from the finished part of the litigation. Their silence and inaction then spoke volumes with respect to their lack of sense of entitlement, further evidencing that the Majority's interpretation produces a result divorced from commercial reality.

Finally, the mere conclusion of entitlement based on a settlement's "functional equivalency" to a license is no substitute for analysis of how any such royalty entitlement "arose" prior to expiration of the PLA, such that it would survive in accordance with PLA provisions. The Majority seeks to escape this constraint by simply declaring that the obligation to the Goldwassers arose "when [Dish Echostar] *manufactured* TV DVRs using DVR Functionality during the term of the PLA." While manufacture is the lynchpin of the Majority

rationale in this regard, that contention was never advanced by the Goldwassers (who ultimately relied on two judicial events). Nor were the Parties ever given the opportunity to analyze this position, or to contest its merits – or lack thereof, since it seeks to equate substantively the timing of infringement of *Tivo's* patent(s) with a trigger for Goldwasser royalty entitlement for the license of its patent, which was never at issue in the litigation. Rather, the justification is imposed unscrutinized without the Parties being heard on it.

At bottom, the Majority improperly grounds its award on a theory that contradicts the express position of the Goldwassers (who rejected the settlement as the basis for their claimed entitlement, and who ultimately relied solely on judicial findings of infringement); the express terms of the PLA (e.g. J042 at Attachment One of 3) (defining that Litigation Recovery to include settlements, but only if "directly attributable to enforcement of the Goldwasser patent against third parties."); contrary to the actual evidence (i.e., the absence of any demonstrated claim of entitlement throughout the commercial dealings between the parties during the life of the contract); and procedurally on a timing rationale that was never raised or vetted in the proceedings. A rationale that at once contradicts core Claimant positions, express contract terms, as well as the facts, is unreasonable if not absurd as a matter of New York law and in contravention of it. *Matter of Lipper*, supra. Neither the agreement to arbitrate contained in the PLA nor applicable New York law granted the Majority any such remedial license to disregard New York law in producing such an award of millions of dollars to the Goldwassers, much less one based on a theory it originated and justifies on a rationale that was never heard.

**III. Conclusion** -- Based on a reading of the contract as a whole, and with due regard to the canons of construction in New York, as well as fundamental federal patent law, I would leave the parties as I find them, with the Goldwassers already compensated by the deal they struck and

with no further royalty entitlement resulting from the Dish Echostar settlement. In contrast the Majority's award reflects a result in search of a reason; they have improperly rewritten the contract to supply one by not letting controlling precedent get in the way. See, e.g., *Hunsinger v. Minns*, 6021 N.Y.S. 2d 284, 285 (N.Y. App. Div. 1993). The Majority thus awards the Goldwassers ███████████████ by creating an implied term that comports with their sense of what is just and fair, but which in doing so disregards New York's law of contract construction and federal patent law As such the Majority acts as the "functional equivalent" of amiable compositeurs, despite not having been authorized to do so by the Parties in their agreement to arbitrate, by the applicable arbitral institution rules applied, or as a matter of applicable law. They have exceeded their powers in these respects, as no such remedial license was conferred on them; I can not join them in doing so.

Accordingly, I dissent as set forth more particularly above.

*(signed)*
Philip D. O'Neill Jr.

I, Philip D. O'Neill, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

8/21/12
Date

*(signed)*
Philip D. O'Neill, Jr.