# EXHIBIT Q

Document1

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 13 117 Y 02109 11

Dorothy Goldwasser, Romi Jones nee Goldwasser and Good Inventions, LLC ("Claimants")

and

TiVo, Inc. ("Respondent")

### FINAL AWARD OF ARBITRATORS

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated March 12, 2004, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows:

In the interest of brevity and economy, and in light of the parties' lack of agreement as to the degree of detail desired in the Award, familiarity with the factual and procedural background of this dispute and with the hearing exhibits is presumed.

Based on the witnesses' testimony and documentary evidence presented during the two-day evidentiary hearing, the arguments set forth by counsel in extensive briefing and well-settled principles of New York law, a majority of the Panel finds that Claimants are entitled to royalties on "TV DVRs" for which TiVo sought a license and received compensation from Dish/EchoStar.

Claimants owned the patent to the first iteration of DVR technology (the "Goldwasser Patent"). Under the Patent License Agreement entered into by the parties on March 12, 2004 ("PLA"), Claimants gave TiVo the exclusive rights to the Goldwasser Patent until its expiration on March 12, 2011, in exchange for (i) an upfront award of TiVo stock, (ii) royalties based on TiVo's licensing of its DVR technology to third parties, and/or (iii) forty percent (40%) of any net litigation recovery that TiVo obtained for infringement of its DVR technology, provided that TiVo elected, in the exercise of its sole discretion, to assert the Goldwasser Patent in such litigation.

The relevant portion of the PLA (Paragraph 1 of Attachment One captioned "Royalties") provides that a one-time royalty will be paid to Claimants for "TV DVRs" manufactured during the term of the PLA. The PLA defines "TV DVRs" as *"Television Boxes that include DVR Functionality, licensed from*

TiVo." In turn, the PLA defines "Television Boxes" as "... *a satellite or cable television receiver, or any future device, the primary purpose of which is to receive and decode video signals (e.g., television signals) and to display such signals on an attached or otherwise connected television set.*" Finally, "DVR Functionality" is defined as "... *functionality that enables consumers to record television programs to a hard disk drive and control a TV display, including pausing, fast forwarding and rewinding live television.*"

Subparagraph 1(a) of Attachment One provides, *inter alia*: "*It is the parties' intention that this Section 1(a) be interpreted in a manner that causes TiVo (on behalf of itself and its licensees and sublicensees) to pay Royalties at the rate set forth above once, whether from license revenue or litigation recovery (but not more than once) per DVR unit.*" [Emphasis added.]

It is undisputed that:

a) Claimants received TiVo stock and approximately ▇▇▇▇▇▇▇ in royalties as a result of various licensing arrangements of TiVo's DVR technology;

b) TiVo unsuccessfully attempted to license its DVR technology to Dish/EchoStar;

c) Had TiVo succeeded in licensing its technology to Dish/EchoStar, Claimants would have received royalties therefrom;

d) TiVo elected not to assert the Goldwasser Patent in its patent infringement suit against Dish/EchoStar;

e) In April, 2006, a jury awarded TiVo damages of $74 million for Dish/EchoStar's past infringement; that amount increased to approximately $100 million when ultimately paid to TiVo;

f) After the jury verdict, protracted legal skirmishing continued for another five years resulting in judicial findings of continued infringement; and

g) In April 2011 (one month after the PLA had terminated), as part of the settlement of the litigation, Dish/EchoStar paid TiVo $500 million dollars, one-third of which ($175 million dollars) was allocated to Dish/EchoStar's continuing infringement from 2006 – 2011.

Claimants make no claim under the PLA's Net Litigation Recovery provisions, which would have yielded 40% of TiVo's net recovery from the $600 million received from Dish/EchoStar had TiVo asserted the Goldwasser Patent in the litigation. Instead, Claimants take the position that the damages ultimately paid to TiVo by Dish/EchoStar are the functional equivalent of licensing revenue for TV DVRs

2

manufactured during the term of the PLA, for which Claimants are entitled to royalties in accordance with the express provisions of Paragraph 1 of Attachment One.

TiVo contends that Claimants' right to royalties under the PLA arises only if TiVo has actually licensed its DVR technology (encompassing the Goldwasser Patent) to a third party, which, in the case of Dish/EchoStar, did not occur.

A majority of the Panel is persuaded that, under all of the relevant circumstances, TiVo's interpretation of the PLA's royalty provision is inconsistent with the PLA's overarching purpose, i.e., to pay royalties to the Goldwassers "...*once whether from license revenue or litigation recovery ...*" and would deprive the Goldwassers of royalties that they had a reasonable expectation of receiving.

For the purpose of determining the Goldwassers' right to royalties under the PLA, the majority is persuaded that a portion of the money TiVo received from Dish/EchoStar via litigation was the functional equivalent of revenue that TiVo would have earned from the licensing arrangement it sought with Dish/EchoStar, which concededly would have resulted in royalties to the Goldwassers.[1]

In arguing the PLA's inapplicability to the revenue it received from Dish/EchoStar, TiVo contends that there is a fundamental distinction between a license to Dish/EchoStar (i.e. permissive use of TiVo's technology) and Dish/EchoStar's infringement (i.e. unauthorized use). However, notwithstanding the relevance of that distinction in various patent litigation contexts, it is not dispositive in determining TiVo's royalty obligations under the PLA.

Indeed, the intertwining between licensing and infringement is illustrated by the use of a "hypothetical royalty" analysis in patent infringement litigation (including the TiVo-Dish/EchoStar litigation), i.e. calculation of the royalties that an infringer would have owed had there been an express license, as a framework for determining the damages payable for infringement.

We find an obligation in the PLA to pay royalties under the circumstances where an infringer is ultimately compelled by litigation to pay revenue that Respondent attempted to obtain through a license.[2] This obligation is "... *implicit in the agreement viewed as whole ...*" and is one that the Goldwassers as "... *reasonable person[s] in the position of the promisee ...*" were "...*justified in*

---

[1] *Wang Labs., Inc. v. Oki Elec. Indus. Co.*, 15 F. Supp.2d 266 (D. Mass. 1998), cited by TiVo, ruled that a settlement sum was not the equivalent of payment for past royalties for purposes of determining whether the settlement, when broken down, equated to a higher royalty rate than the defendant's and thus violated defendant's Most Favored Licensee provision. Given its context, even if the ruling were from a New York court, it is inapposite here.

[2] In reaching this conclusion, the majority gives no weight to ███████████████████████████████████████████████████████████ Similarly, we decline to draw a negative inference from Claimants' failure to have asserted their claim earlier.

3

*understanding was included." Rowe v. Great Atlantic & Pacific Tea Company, Inc.,* 46 N.Y. 2d 62, 69, 412 N.Y.S.2d 827 (1978), cited with approval in *Dalton v Educational Testing Service,* 87 N.Y. 2d 384, 389, 639 N.Y.S.2d 977 (1995).

Additionally, this promise was *"...encompassed within the implied obligation..."* of TiVo *"...to exercise good faith ..."* and not to do *"... anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Dalton v Educational Testing Service, supra* at 390.

Absent the implied obligation of good faith, Claimants' entitlement to royalties would be subject to forces completely beyond their control, as there were no minimum royalty guarantees in the PLA. Such a result contravenes the parties' expressed intentions, i.e. to forge a "win-win" partnership in which Claimants would share in TiVo's growth whether by licensing or litigation, as testified to by the Respondent. Moreover, it would have the effect of preventing Claimants from receiving the benefits of their bargain in exchange for TiVo's exclusive rights to their patent, an outcome disfavored under New York law. *See, e.g. Kirke La Shelle Co. v. Armstrong Co.,* 263 N.Y. 79 (1933); *Wood v. Duff-Gordon,* 222 N.Y. 88 (1917).

Finally, the fact that TiVo and Dish/EchoStar finalized the settlement agreement subsequent to the PLA's termination did not extinguish TiVo's obligation to pay royalties for TV DVRs manufactured during the term of the PLA. Paragraph 9.3 of the PLA provides that payment obligations arising prior to termination survive the termination of the PLA. The payment obligation at issue here "arose" not when Dish/EchoStar agreed to write the settlement check, but when it manufactured TV DVRs using DVR Functionality during the term of the PLA.

Turning then to the amount of royalties to be awarded, the PLA royalty formula calls for one-time per-unit payment to be multiplied by the number of TV DVR units manufactured on or after January 1, 2004 through March 12, 2011.[3] Because no records establishing the number of Dish/EchoStar units manufactured were available to either party in this proceeding, both experts extrapolated figures from Dish/EchoStar subscriber statistics and other sources.

---

[3] Although TiVo, Dish/EchoStar, and the courts all invoked hypothetical royalty calculations to reach damages amounts, those calculations do not apply neatly here because they were based on the number of Dish/EchoStar subscribers rather than units (the relevant yardstick under the PLA), and were based on monthly royalties rather than one-time payments.

4

TiVo contends that if royalties are to be awarded by analogizing Dish/EchoStar's infringement to a de facto "license," then royalties logically should be paid only on those Dish/EchoStar TV DVR units that were found to have been infringing, i.e. 8 models specified by the jury in its 2006 verdict. However, following the verdict, the court sanctioned Dish/EchoStar for continuing to infringe, the sanctions were appealed, and the parties ultimately reached a settlement with no definitive judicial ruling on the breadth of Dish/EchoStar's continuing infringement. The settlement allocated $175 million (one-third of the settlement amount) to past infringement, i.e. infringement from 2006 through 2011. Accordingly, limiting Claimants' royalties to a smaller universe of units is unwarranted.

With respect to the parties' differing estimates of the total Dish/EchoStar TV DVR units manufactured during the term of the PLA, the majority is mindful of the inherent imprecision of the estimates given the asymmetry between the number of DVR subscribers (the statistics of which are available) and the number of units. Having considered the parties' experts' reports in this arbitration and their testimony at the hearing, the majority finds that approximately ▮▮▮▮ were manufactured during the term of the PLA. ▮▮▮▮ Claimants are awarded ▮▮▮▮

## Award

1. TiVo, Inc. shall pay to Claimants the sum of ▮▮▮▮ within 30 days from the date of this Award.

2. The administrative fees of the American Arbitration Association totaling ▮▮▮▮

3. This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

5

22 AUGUST 2012 _____  _____
Date                              Elizabeth Gilbert

_____                 _____
Date                              Abigail Pessen


I, Elizabeth Gilbert, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

22 AUG 2012 _____    _____
Date                              Elizabeth Gilbert


I, Abigail Pessen, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____                 _____
Date                              Abigail Pessen

6

_____      _____
Date                          Elizabeth Gilbert

Aug. 22, 2012
Date                          Abigail Pessen

I, Elizabeth Gilbert, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.


_____      _____
Date                          Elizabeth Gilbert


I, Abigail Pessen, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

Aug. 22, 2012
Date                          Abigail Pessen

6