**CONFIDENTIAL – FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In the Matter of Arbitration between | ) | Civil Action No. 12-cv-7142 (LLS) |
| TiVo, Inc., a Delaware Corporation, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| -against - | ) | |
| | ) | |
| Dorothy Goldwasser, | ) | |
| Romi Jones née Goldwasser, and | ) | |
| Good Inventions, LLC, a New York | ) | |
| Limited liability Company, | ) | |
| | ) | |
| Respondents. | ) | |

**RESPONDENTS' MEMORANDUM OF LAW
IN OPPOSITION TO PETITIONER'S MOTION
TO VACATE ARBITRATION AWARD**

# TABLE OF CONTENTS

INTRODUCTION..............................................................................................1

I. NEW YORK STATE LAW, NOT THE FEDERAL ARBITRATION ACT,
   PROVIDES THE STANDARD FOR REVIEW OF THE FINAL AWARD.....................2

   A. New York Law Requires that TiVo's Petition to Vacate Be Denied....................2

      1. The Panel's Award Does Not "Violate a Strong Public Policy" .................4

      2. The Panel's Award Is Not "Totally Irrational" .....................................4

      3. The Panel's Award Does Not Exceed Any "specifically
         enumerated limitation" on the Arbitration Panel's Power........................5

   B. The Federal Arbitration Act Requires that TiVo's Petition to Vacate Be Denied......5

II. TIVO HAD A FULL AND FAIR OPPORTUNITY TO PRESENT
    ITS EVIDENCE AND LEGAL ARGUMENT REGARDING THE
    IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING...........................6

    (Response to TiVo Brief, Part II, pp. 12-13.)

III. THE ARBITRATION PANEL'S FINAL AWARD IS NOT IRRATIONAL,
     DOES NOT EXCEED THE PANEL'S POWERS, AND DOES NOT
     CONSTITUTE A MANIFEST DISREGARD FOR THE LAW...............................10

    A. The Panel Properly Based Its Award, in Part,
       on the Implied Covenant of Good Faith and Fair Dealing................................11

       (Response to TiVo Brief, Part III.A, pp. 14-15.)

    B. The Goldwassers (and the Arbitration Panel) Are Not Estopped from
       Referring to and Using the April 29, 2011 Settlement Agreement.....................14

       (Response to TiVo Brief, Part III.B, pp. 15-17.)

    C. The Award Does Not Contravene the PLA's Survival Provision........................19

       (Response to TiVo Brief, Part III.B, last para., p. 16,
       and Part III.C.2.a, para. "First," pp. 18.)

    D. The Goldwassers' Do Not Seek a Recovery
       Under Section 3, Attachment One, of the PLA.........................................20

i

(Response to TiVo Brief, Part III.C.2.a, para. "Second," pp. 18-19.)

E.  As One of its Four Bases for its Award, the Arbitration Panel Used
    Traditional Gap-Filling Analysis to Provide an Essential Term of the Contract........21

    (Response to TiVo Brief, Part III.C.2.b, p. 19.)

F.  The Panel's Final Award Does Not Result
    in a "Commercially Absurd Result".......................................................23

    (Response to TiVo Brief, Part III.C.2.b, p. 19-20.)

G.  TiVo's Argument and Case Law Regarding Patent
    Licenses and Patent Litigation Is Inapposite..............................................24

    (Response to TiVo Brief, Part IV.B.1, pp. 21-23.)

H.  The Arbitration Panel Properly Held that Revenue that TiVo
    Received from EchoStar via the Patent Infringement Litigation
    Was the Functional Equivalent of Revenue from a Licensing Arrangement...........28

    (Response to TiVo Brief, Part IV.B.2, pp. 23-24.)

IV.  UNDER NEW YORK LAW, THE ARBITRATION PANEL CAN
     TAKE INTO ACCOUNT EQUITABLE CONSIDERATIONS................................32

V.  CONCLUSION.........................................................................34

## TABLE OF AUTHORITIES

Cases

*Am. Ass'n of Bioanalysts v. New York Dept. of Health,*
75 A.D.3d 939 (N.Y. App. Div. 2010)...............................................................19

*Areca, Inc. v. Oppenheimer & Co.*, 960 F.Supp. 52 (1997)...........................................10

*Ball Aerosol and Specialty Container, Inc. v. Limited Brands, Inc.,*
514 F. Supp.2d 1051 (N.D. Ill. 2007)..............................................................29, 31

*Barbier v. Shearson Lehman Hutton*, 948 F.2d 117 (2d Cir. 1991)....................................5

*Carborundum Co. v. Molten Metal Equip. Innovations, Inc.,*
72 F.3d 872 (Fed. Cir. 1995)........................................................................25

*Commonwealth Scientific and Industrial Research Organisation v.*
*Buffalo Technology Inc.*, 492 F.Supp.2d 600 (E.D. Tex. 2007)......................................29

*County of Nassau v. Chase*, 402 F. App'x 540 (2d Cir. 2010) .......................2, 3, 4, 5, 33, 34

*Courier-Citizen Co. v. Boston Electrotypers Union No. 11,*
702 F.2d 273 (1st Cir. 1983)........................................................................12

*De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236 (1927).........................25, 27

*Del Mar Avionics, Inc. v. Quinton Instrument Co.,*
836 F.2d 1320 (Fed. Cir. 1987)......................................................................30

*D.H. Blair and Co. v. Gottdiener*, 462 F3d 95 (2d Cir. 2006).........................................6

*Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998).....................27

*Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512 (2d Cir. 1991)....................................12

*Fensterstock v. Educ. Fin. Partners*, 611 F.3d 124 (2d Cir. 2010)....................................2

*Florasynth, Inc. v. Pickholz*, 750 F.2d 171 (2d Cir.1984).............................................5

*Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108 (2d Cir. 1993)..............................6

*Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988).........................27

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
318 F. Supp. 1116 (S.D.N.Y. 1970)..................................................................31

*Glauber v. Glauber*, 600 N.Y.S.2d 740 (N.Y.A.D. 2 Dept. 1993) ....................................33

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 216 F.Supp. 3d 1175 (D. Colo. 2000).......................30

*Harper Ins. Ltd. v. Century Indem. Co.*, 819 F.Supp.2d 270 (S.D.N.Y. 2011)...................4, 11

*Home Ins. Co. v. Rha/Pennsylvania Nursing Homes*,
113 F.Supp.2d 633 (S.D.N.Y. 2000) ...............................................................................3

*Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
757 F. Supp. 283 (S.D.N.Y. 1991)...................................................................................3

*Hygrade Operators Inc. v. Local 333, United Marine Division*,
945 F.2d 18 (2d Cir. 1991)..............................................................................................5

*Info. Res., Inc. v. Test Mktg. Grp., Inc.*, 22 F.3d 1102 (Fed. Cir. 1993)..............................26

*Islamaj v. Quaker Hill Venture, LLC*, 2002 NY Slip Op 30163 (N.Y. Sup. Ct. 2011)..............4

*Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79 (1933)......................................12, 22

*Maas v. Cornell University*, 253 A.D.2d 1 (N.Y. App. Div. 1999)....................................19

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) ................................2

*Matter of Hartsdale Fire Dist. v. Eastland Constr., Inc.*,
65 A.D.3d 1345 (N.Y. App. Div. 2009)...........................................................................19

*Motor Vehicle Accident Indemnification Corp. v. Aetna Cas. & Sur. Co.*,
89 N.Y.2d 214 (1996)....................................................................................................5

*N.Y.C. Transit Auth. v. Transp. Workers' Union of Am., Local 100, AFL-CIO*,
6 N.Y.3d 332 (2005)...........................................................................................3, 11, 34

*Oracle America, Inc, v. Google Inc.*, No. C 10-03561 WHA (N.C. Cal. Jan, 9, 2012) ............29

*Ottley v. Schwartzberg*, 819 F.2d 373 (2d Cir. 1987)....................................................6

*PMA Capital Insurance Co. v. Platinum Underwriters Bermuda, Ltd.*,
659 F.Supp.2d 631 (E.D. Pa. 2009).................................................................................12

*Raytheon Mfg. Co. v. Radio Corp. of Am.*, 286 Mass. 84 (Mass. 1934)..............................27

*Rite-Hite Corporation v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995)..................................31

*Roche v. Local 32B-32J Serv. Employees Int'l Union*, 755 F.Supp. 622 (S.D.N.Y. 1991)........6

*Rude v. Westcott*, 130 U.S. 152 (1889)……………………………………….........................26

*Shatterproof Glsss Corp. v. Libbey-Owenjs-Ford-Co*,
482 F.2d 317 (6th Cir. 1973), *cert. denied*, 415 U.S. 918 (1974)……………….....................27

*Silverman v. Benmore Coats*, 61 N.Y.2d 299, 473 N.Y.S.2d 774 (1984)………….3, 4, 11, 33, 34

*Spindelfabril Suessen-Schurr, Stahledker & Grill GmbH v. Schubert &*
*Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075 (Fed. Cir. 1987)…………………..25

*Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16 (2d Cir. 1967)…………..…………………….10

*TiVo Inc. v. DISH Network Corp.*, No. 2:04-CV-01 (DF) (E.D. Tex. September 4, 2009)……...32

*TiVo Inc. v. DISH Network Corp.*, No. 2:04-CV-01 (DF) (E.D. Tex. June 2, 2009)…………..32

*Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.*,
607 F.2d 649 (5th Cir. 1979)……………………………………………………………….13

*Transcore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009)……….25

*United Steelworkers of America v. Enterprise Wheel and Car Corp.*,
363 U.S. 593 (1960)……………………………………………………………...............13

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
489 U.S. 468 (1989)……………………………………………………………………….2

*Wang Labs, Inc. v. Oki Elec. Indus. Co.*, 15 F.Supp. 2d 166 (D. Mass. 1998) …………………27

*Wood v. Duff-Gordon*, 222 N.Y. 88 (1917)………………………………………………..22

## Articles

Gwartney, Troy L., *Harmonizing the Exclusionary Rights of Patents with*
*Compulsory Licensing*, 50 Wm. & Mary L.Rev. 1395 (2009)
http://scholarship.law.wm.edu/wmlr/vol50/iss4/12.........................................................................29

## Statutes

Federal Arbitration Act, 9 U.S.C. §§ 9 and 10 …………………………….....................6, 10, 24

Patent Act, 35 U.S.C. § 284…………………………………………………………….30

New York C.P.L.R., §§ 5001 and 5004……………………………………………....…....24, 25

New York C.P.L.R. §§ 7510 and 7511……………………………………….…………3, 24

<u>Miscellaneous</u>

American Arbitration Association Commercial Rules 32 and 36………………………………..9

Respondents Dorothy Goldwasser, Romi Jones née Goldwasser, and Good Inventions, LLC (collectively, "the Goldwassers") oppose Petitioner TiVo, Inc.'s ("TiVo's") Petition to Vacate Arbitration Award, and have filed with this Court their motion to confirm the August 22, 2012 Final Award of Arbitrators in the American Arbitration Association arbitration proceeding, No. 13 117 Y 02109 11. *See* Final Award (Ex. Q).[1]

The Arbitration Panel's Final Award states that "familiarity with the factual and procedural background of the dispute and the hearing exhibits is presumed." The Goldwassers respectfully refer the Court to their brief in support of their Motion to Confirm Arbitration Award and for Entry of Judgment, which provides such factual and procedural background.[2]

---

[1] Citations to the record are as follows:

| Citation | Reference |
| --- | --- |
| PLA (Ex. A) | Patent License Agreement, appearing as Snader Decl. Ex. A |
| G. Prehg. Brief (Ex. S) | Goldwassers' Prehearing Brief, appearing as Snader Decl. Ex. S |
| G. Posthg. Brief (Ex. G) | Goldwassers' Posthearing Brief, appearing as Snader Decl. Ex. G |
| G. Reply Brief (Ex. I) | Goldwassers' Posthearing Reply Brief, appearing as Snader Decl. Ex. I |
| G. Sur-Reply Brief (Ex. L) | Goldwassers' Response to TiVo's Sur-Reply Brief, appearing as Snader Decl. Ex. L |
| G. Supp. Brief (Ex. N) | Goldwassers' Supplementary Brief Requested by Panel, appearing as Snader Ex. N |
| Final Award (Ex. Q) | Final Award of the Arbitration Panel, appearing as Snader Decl. Ex. Q |
| Dissent (Ex. P) | Dissent from Final Award, appearing as Snader Decl. Ex. P |

Additionally, attached to the Declaration of Tobey B. Marzouk are certain exhibits that were accepted into evidence by the Arbitration Panel: (i) Joint Exhibit J001, the Goldwasser Patent (not confidential), (ii) Joint Exhibits J002 – J091 (confidential – filed under seal), (iii) Goldwasser Exhibits C01 – C19 and C21 – C28 (not confidential) and (iv) TiVo Exhibit R024, excerpts from TiVo's Expert Witness Report (confidential – filed under seal). The joint exhibits are referred to as Ex. J001, Ex. J002, etc.; the Goldwasser exhibits as Ex. C01, Ex. C02, etc.; and TiVo's Expert Witness Report as Ex. R024. All other citations are to the Snader Declaration ("Snader Decl."), with the appropriate exhibit referenced.

[2] TiVo's brief, at p. 20, sets forth a highly partisan, to put it charitably, rendition of the "facts" and then states "[n]one of these facts are in dispute." In order to properly respond, the Goldwassers' brief in support of their Motion to Confirm provides additional information concerning, in particular, the bargain struck by the parties; why the parties agreed that royalties were owed to the Goldwassers when the Goldwasser Patent was not expressly licensed; and how the PLA, in its definition section, implements this agreement in the phrase "DVR Functionality licensed from TiVo;" as well as further background information about the TiVo/EchoStar litigation.

# I. NEW YORK STATE LAW, NOT THE FEDERAL ARBITRATION ACT, PROVIDES THE STANDARD FOR REVIEW OF THE FINAL AWARD

## A. New York Law Requires that TiVo's Petition to Vacate Be Denied

The "Governing Law" provision of the Patent License Agreement between the Goldwassers and TiVo ("PLA") states:

> This Agreement has been made and entered into under the laws of the State of New York and shall be interpreted, governed by <u>and enforced</u> in accordance with and consistent with the laws of the State of New York, which shall apply in all respects, including statutes of limitation, to all disputes or controversy arising out of or pertaining to this Agreement.

PLA, Section 16, p. 7 (Ex. A) (emphasis added). In addition, the "Arbitration and Venue" provision of the PLA states, *inter alia*:

> Any judgment to be entered in court upon any award rendered by all or a majority of the arbitrators shall be entered in a state or federal court located in New York, New York. Any action brought <u>to enforce</u> any aspect of this Agreement shall be brought in the state or federal courts located in New York, New York.

*Id.*, Section 17 (emphasis added). The PLA, drafted by TiVo, unambiguously states that in enforcement proceedings in the federal courts, such as the instant case, the PLA shall be enforced in accordance with New York law. This is not a generic choice-of-law provision that leaves the default rules of the Federal Arbitration Act applicable, *see Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 53, 58-64 (1995) and its progeny, but a specific agreement by the parties that New York law would govern enforcement of the PLA.

In *County of Nassau v. Chase*, 402 F. App'x 540 (2d Cir. 2010), where the contract provided that the enforcement proceeding, *i.e.*, an appeal from the arbitration award, was governed exclusively by New York law, the Second Circuit held that:

> the [parties'] designation must be honored by the courts unless the state law conflicts with federal law. *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 470, 477-78 (1989). This is true even when the contract involves interstate commerce and would otherwise fall within the coverage of the Federal Arbitration Act ("FAA"). *Id.* at 476-78; *see also Fensterstock v. Educ. Fin. Partners*, 611 F.3d 124, 132 (2d Cir. 2010) (noting

2

> that state law is generally applicable to arbitration appeals and that FAA only preempts when state law actually conflicts with federal law). . . . Because New York law accords with the policies of the FAA (in favor of binding arbitration), federal law does not preempt New York state law here. New York state law therefore governs our review of this arbitration award. Accordingly, while we agree with the District Court that the arbitral award must be confirmed, we do so pursuant to N.Y. C.P.L.R. § 7510, and not the Federal Arbitration Act, 9 U.S.C. § 9, as the District Court did.

*County of Nassau*, 402 F. App'x 540.[3] *See Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 757 F. Supp. 283 (S.D.N.Y. 1991)(New York arbitration statute required that federal district court refuse to modify award); *Home Ins. Co. v. Rha/Pennsylvania Nursing Homes*, 113 F.Supp.2d 633 (S.D.N.Y. 2000) (federal district court granted petitioner leave to amend in order to state basis for award's confirmation under New York law).

New York case law establishes that Section 7511(b)(1)(iii) of New York Civil Practice and Procedure,[4] regarding an arbitration panel exceeding its powers, provides three bases for overturning an arbitration award – when it "violates a strong public policy, is irrational or clearly exceeds a specifically enumerated limitation on the arbitrator's power." *N.Y.C. Transit Auth. v. Transp. Workers' Union of Am., Local 100, AFL-CIO*, 6 N.Y.3d 332, 336 (2005) (cited in *County of Nassau*, 402 F. App'x 540); *Silverman v. Benmore Coats*, 61 N.Y.2d 299, 308, 473 N.Y.S.2d 774, 779 (1984)("award will not be vacated even though the court concludes that [the

---

[3] TiVo's petition to vacate relies on *County of Nassau* to identify an element of the federal standards for review of arbitration awards, completely ignoring the main thrust of the case, which requires the application of state law standards of review when the parties have agreed that state law governs the enforcement of the arbitration award.

[4] New York Civil Practice and Procedure, Section 7511(b)(1), states that an award shall be vacated "if the court finds that the rights of that party were prejudiced by:

  (i) corruption, fraud or misconduct in procuring the award; or
  (ii) partiality of an arbitrator appointed as a neutral, except where the award was by confession; or
  (iii) an arbitrator, or agency or person making the award exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made; or
  (iv) failure to follow the procedure of this article, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection.

arbitrator's] interpretation of the agreement misconstrues or disregards its plain meaning or misapplies substantive rules of law, unless it is violative of a strong public policy, or is totally irrational, or exceeds a specifically enumerated limitation on his power")(cited in *County of Nassau*); *Harper Ins. Ltd. v. Century Indem. Co.*, 819 F.Supp.2d 270, 275 n.9 (S.D.N.Y. 2011)(citing *Silverman v. Benmore Coats*); *Islamaj v. Quaker Hill Venture, LLC*, 2002 NY Slip Op 30163, at 4 (N.Y. Sup. Ct. 2011)(citing *Silverman v. Benmore Coats*).

### 1. The Panel's Award Does Not "Violate a Strong Public Policy"

The Final Award makes evidentiary findings and conclusions of law for the purpose of interpreting and applying the provisions of a private, commercial contract. Neither during the arbitration proceeding nor in its petition to vacate has TiVo identified any public policy that would be violated by the Panel's Final Award. There is no basis for TiVo to claim that the Final Award "violates a strong public policy."

### 2. The Panel's Award Is Not "Totally Irrational"

Given the hyperbole in TiVo's petition to vacate, undoubtedly TiVo will assert that the Final Award is "totally irrational." For this reason, the Goldwassers describe in their Memorandum of Law in Support of their Motion to Confirm Arbitration Award, filed herewith, the business transaction entered into by the parties in 2003 and 2004, how the PLA implements the bargain struck by the parties, TiVo's efforts to enter into a license with EchoStar, the course of events during TiVo's patent infringement litigation against EchoStar, and the Panel's reasoning for finding that TiVo owes the Goldwassers royalties for each TV DVR manufactured by or for EchoStar during the term of the PLA. Furthermore, as discussed in that brief, the Arbitration Panel sets forth four independent and sufficient rational bases for the Final Award,

founded on well-accepted principles of New York law. However, even if this were not the case, New York case law mandates that the Award be upheld. As stated in *County of Nassau*:

> Under New York law, arbitrators are not bound by principles of substantive law or legal procedure: An arbitrator "may do justice as he sees it, applying his own sense of law and equity to the facts as he finds them to be and making an award reflecting the spirit rather than the letter of the agreement." *Silverman v. Benmor Coats, Inc.*, 61 N.Y.2d 299, 308 (1984). Misapplication of law and errors of fact are insufficient to overturn an award. *Motor Vehicle Accident Indemnification Corp. v. Aetna Cas. & Surety Co.*, 89 N.Y.2d 214, 223 (1996).

*County of Nassau*, 402 F. App'x 540. The Arbitration Panel in this proceeding conscientiously and correctly "adduced facts and explained how those facts support their ultimate decision," *id.*, and correctly applied New York contract law. Therefore, the Final Award should be confirmed.

### 3. The Panel's Award Does Not Exceed Any "specifically enumerated limitation" on the Arbitration Panel's Power

Neither before the Arbitration Panel nor in its petition to vacate has TiVo even hinted that an award by the Panel would or did exceed "a specifically enumerated limitation on the arbitrator's power." This element of New York law is not applicable to the facts of this case.

## B. The Federal Arbitration Act Requires that TiVo's Petition to Vacate Be Denied

Under the Federal Arbitration Act, confirmation of an arbitration award is a "summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir.1984). "The arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." *Barbier v. Shearson Lehman Hutton*, 948 F.2d 117, 121 (2d Cir. 1991). "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *Hygrade Operators Inc. v. Local 333*,

*United Marine Division,* 945 F.2d 18, 22 (2d Cir. 1991); *see D.H. Blair and Co. v. Gottdiener,* 462 F3d 95, 110 (2d Cir. 2006).

The **party moving to vacate** an arbitration award bears the **burden of proof**, *see Roche v. Local 32B-32J Serv. Employees Int'l Union,* 755 F.Supp. 622, 624 (S.D.N.Y. 1991); *Ottley v. Schwartzberg,* 819 F.2d 373, 376 (2d Cir.1987)(the showing required to defeat confirmation is high). This limited judicial review is to "avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir. 1993).

As discussed below, the Arbitration Panel's Final Award and the legal conclusions therein are based on testimony of fact and expert witnesses, documents introduced into evidence and extensive briefing by the parties. There is no basis under either the New York arbitration statute or the Federal Arbitration Act to vacate the Final Award. Accordingly, TiVo's Motion to Vacate should be denied and the Goldwassers' Motion to Confirm should be granted.

## II. TIVO HAD A FULL AND FAIR OPPORTUNITY TO PRESENT ITS EVIDENCE AND LEGAL ARGUMENT REGARDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(Response to TiVo Brief, Part II, pp. 12-13.)

TiVo argues, at pp. 12-13 of its brief in support of its Motion to Vacate, that the Panel did not comply with Section 10(a)(3) of the FAA because "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy . . . ." (Emphasis added.) Specifically, TiVo says that the Panel refused to hear evidence and legal argument that the implied covenant of good faith and fair dealing could be used to address a gap in the PLA, and thus the Panel's award must be vacated.[5]

---

[5] The Panel states that "[w]e find an obligation in the PLA to pay royalties under the circumstances where an infringer [EchoStar] is ultimately compelled by litigation to pay revenue that [TiVo] attempted to

6

First, TiVo applies the incorrect law. With respect to this specific holding by the panel, as well as generally, TiVo has not identified any provision of New York's arbitration law that provides a basis for vacating the award.

Second, as set forth in the Goldwassers' brief in support of their Motion to Confirm (Subsection V.B.2 therein), the implied covenant of good faith and fair dealing is only one of four bases for the Final Award. As long as any one of these four bases survive TiVo's challenge under New York law (or, according to TiVo, under the FAA), the Final Award must be upheld and confirmed.

Third, TiVo had ample opportunity, and indeed availed itself of that opportunity, to present evidence and legal argument addressing the applicability of the implied covenant of good faith and fair dealing and whether it should be applied to resolve the dispute. During the hearing there was extensive testimony from all three fact witness – Todd Goldwasser, Romi Goldwasser and Matthew Zinn, TiVo's representative – about the overall structure of the PLA, the three provisions of the PLA that provided compensation to the Goldwassers, the absence of any obligation of TiVo to either pursue infringers of the Goldwasser Patent or to license its DVR technology, TiVo's business model, and how the PLA's provisions implemented the parties' intent that the agreement be a "win-win" partnership. The Final Award expressly makes three critical evidentiary findings based on the hearing testimony: (i) the Goldwassers' "entitlement to royalties would be subject to forces completely beyond their control" (if the implied obligation

---

obtain through a license [from EchoStar]," arising from "'the implied obligation . . .' of TiVo '. . . to exercise good faith.'" Final Award, p. 3-4 (Ex. Q). TiVo's brief, at p. 13, and the Dissent, at p. 6 (Ex. P) state that TiVo's "conduct of the Dish EchoStar Litigation" and "conduct . . . in settling [that litigation] when it did (after expiration of the PLA)" constitute the alleged breach of TiVo's duty of good faith and fair dealing. The Final Award never states that such conduct is a breach of the duty of good faith and fair dealing. The breach is the failure to pay royalties owed to the Goldwassers in particular circumstances, not TiVo's conduct of the TiVo/EchoStar litigation (which TiVo pursued tenaciously) or the timing of the TiVo/EchoStar settlement (which was as much in EchoStar's as TiVo's control).

of good faith was not present), (ii) "there were no minimum royalty guarantees in the PLA," and (iii) "the parties expressed intentions" were "to forge a 'win-win' partnership in which [the Goldwassers] would share in TiVo's growth whether by licensing or litigation, <u>as testified to by the Respondent</u>." Final Award, p. 4 (Ex. Q) (emphasis added). The Respondent – TiVo – "spoke" through its sole fact witness, Matthew Zinn, its General Counsel.

On July 12, 2012, after the evidentiary hearing, the Arbitration Panel also requested that the parties brief four questions. (Ex. M) Question 2 stated: "should a 'gap' analysis be applied to the contract if the contract did not address the above scenario and if so how should it be applied?" *Id.* The "above scenario," set forth in the Panel's first question, described the situation that gave rise to the dispute:

> TiVo would be compensated (via litigation in which the Goldwasser Patent was not asserted [i.e., the TiVo-EchoStar litigation]) based on a third party's use of "DVR functionality" [i.e., TiVo's patent] and that such compensation [to TiVo] would trigger no royalty obligation to the Goldwassers [i.e., the gap that the implied covenant of good faith and fair dealings fills];

*Id.*

TiVo thereupon submitted its Response to the Panel's Questions (Ex. O), which presented extensive argument that no gap existed. *Id.*, pp. 5-9. The Goldwassers, stating that they had no objection to use of a gap analysis, submitted their Supplementary Brief Requested by Panel (Ex. N), which cited New York case law, the Restatement (Second) of Contracts, the Uniform Commercial Code, contract law treatises and law review articles for the proposition that the implied covenant of good faith and fair dealing could be used to fill the contract's gap. *Id.*, pp. 4-10. TiVo, because of the Panel's question, was on notice of the relevance of gap analysis and the use of the implied covenant of good faith and fair dealing to fill a contract's gap. TiVo, however, ignored the second part of the Panel's question, "and if so how should it be applied," (Ex. M, Question 2) and elected to focus its argument on the assertion that there was no gap in

8

the contract. (Ex. O, pp 5-9) Thus, TiVo cannot complain now that it had no opportunity to address how the implied covenant of good faith and fair dealing could fill the gap.

Fourth, the American Arbitration Association Commercial Arbitration Rules ("AAA Rules") expressly allow the parties to initiate post-hearing requests to submit additional evidence or legal argument, even after the hearing has been closed. Numerous options were available to TiVo under the AAA Rules to present additional evidence and argument, even after receiving the Goldwassers' brief responding to the Panel's questions. TiVo could have requested that the Panel (i) accept additional evidence via an affidavit,[6] (ii) accept additional documents or other evidence after the hearing,[7] or (iii) reopen the hearing.[8] TiVo availed itself of none of these opportunities to submit additional evidence or argument.

The parties' briefs in response to the Panel's questions were submitted to the Panel on July 30, 2012. (Exhibits N and O), and as of that date the hearing was declared closed. Marzouk Decl., ¶ 3. Over three weeks later, on August 23, 2012, the AAA transmitted the signed Final Award to the parties. Marzouk Decl., ¶ 4.

Under AAA Rules 32 and 36 (see footnotes 6, 7, and 8), TiVo had until August 23, 2012 to request the opportunity to submit additional evidence and legal argument. After receiving the Panel's questions on July 12, 2012 – which put TiVo on notice of the legal theories under consideration by the Panel – TiVo had six weeks until the August 23, 2012 Final Award issued

---

[6] AAA Rule 32(a) states: "The arbitrator may receive and consider the evidence of witnesses by declaration or affidavit . . . ."

[7] AAA Rule 32(b) states: "If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the Arbitrator."

[8] AAA Rule 36 states: "The hearing may be reopened on the arbitrator's initiative, or upon application of either party, at any time before the award is made."

to make such request. And, after receiving the Goldwassers' brief responsive to the Panel's questions on July 30, 2012, TiVo still had more than three weeks to make such request. TiVo, however, did not do so.

Fifth, TiVo has never made a proffer of what "evidence pertinent and material to the controversy" has not been presented to the Panel. *See Areca, Inc. v. Oppenheimer & Co.*, 960 F.Supp. 52, 54-55 (1997)(claim that arbitrators refused to hear evidence denied because of inadequate proffer of evidence; under FAA, party not denied a "fundamentally fair hearing"). Thus, this Court has no basis to conclude that any evidence meeting the statutory test – "pertinent and material to the controversy" – exists that could be presented if this matter were remanded to the Arbitration Panel for further proceedings. *See Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20-21 (2d Cir. 1967) (appellate court conducted detailed fact-based analysis to determine whether absent witness's testimony would be "pertinent and material to the controversy").

Sixth, the Panel never "refused," as is disingenuously asserted by TiVo, to hear further evidence or argument from TiVo. As discussed above, not once did TiVo ever request of the Panel the opportunity to submit additional evidence or legal briefing, either before or after the hearing was closed.[9] Therefore, Section 10(a)(3) of the FAA does not apply because the Panel never refused any request by TiVo to submit additional evidence or legal argument.

## III.   THE ARBITRATION PANEL'S FINAL AWARD IS NOT IRRATIONAL, DOES NOT EXCEED THE PANEL'S POWERS, AND DOES NOT CONSTITUTE A MANIFEST DISREGARD FOR THE LAW

---

[9] In the single case cited by TiVo for the proposition that the Panel deprived TiVo of a fair hearing, *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1967), a party had "urged the panel to keep the record open until [the witness] could testify either in person or by deposition." In that circumstance, where a specific request was made to and then refused by the panel, the court concluded that Section 10(a)(3) of the FAA provided a basis for vacating the award and remanding the case to the district court.

TiVo presents a hodgepodge of arguments to undercut the Arbitration Panel's ruling. TiVo's arguments are factually and legally incorrect, and in no event meet the threshold for vacating the award under New York law, *see Harper Ins. Ltd. v. Century Indem. Co.*, 819 F.Supp.2d 270, 275 n.9 (S.D.N.Y. 2011); *N.Y.C. Transit Auth. v. Transp. Workers' Union of Am., Local 100, AFL-CIO*, 6 N.Y.3d 332, 336 (2005); *Silverman v. Benmore Coats*, 61 N.Y.2d 299, 308, 473 N.Y.S.2d 774, 779 (1984); nor the "exceeds the power" or "manifest disregard of the law" standards under the FAA.

### A. The Panel Properly Based Its Award, in Part, on the Implied Covenant of Good Faith and Fair Dealing

(Response to TiVo Brief, Part III.A, pp. 14-15.)

As a preliminary matter, TiVo's brief misrepresents events during the course of the arbitration. At page 14, TiVo states that "[t]he Goldwassers never relied on the implied covenant of good faith." This statement ignores pages 4-10 of the Goldwassers' Supplementary Brief Requested by Panel (Ex. N), where, in response to the Panel's second question, the Goldwassers reviewed New York law applying the covenant of good faith and fair dealing to fill contract gaps.

In addition, TiVo, at page 14 of its brief, states that in its July 30, 2012 filing in response to the Panel's questions:

> the Goldwassers admitted that <u>TiVo had not breached any implied covenant of good faith and fair dealing</u>, stating that "TiVo may elect not to assert the Goldwasser Patent" based on the PLA and that "the Goldwassers do not contest TiVo's exercise of its discretion [not to assert the Goldwasser Patent against EchoStar]." (Emphasis added.)

The Goldwassers did no such thing. The Goldwassers contended, and the Arbitration Panel concluded, that TiVo's failure to pay royalties under <u>Section 1</u> of the PLA's Attachment One constituted a breach of the implied covenant of good faith and fair dealing, not that TiVo had

breached any implied covenant arising from <u>Section 3</u> of the PLA's Attachment One, which
addresses the situation when TiVo asserts the Goldwasser Patent against a third party.

The issue before the Arbitration Panel was whether TiVo's failure to pay royalties
constituted a breach of the PLA. The implied covenant of good faith and fair dealing is part of
every contract under New York law:

> [I]n every contract there is an implied covenant that neither party shall do
> anything which will have the effect of destroying or injuring the right of the other
> party to receive the fruits of the contract, which means that <u>in every contract there
> exists an implied covenant of good faith and fair dealing.</u> (Citations omitted.)

*Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)(emphasis added).

Accordingly, the Arbitration Panel cannot have exceeded its authority when, for one basis of its
award, it relied on this implied covenant that exists in every contract under New York law.

TiVo cites no cases under New York law for the proposition that the implied covenant of
good faith and fair dealing presents an issue that exceeded the Panel's authority. Moreover, none
of the five cases cited by TiVo as precedent under the FAA, Section 10(d), even remotely relates
to a court ruling that a legal issue regarding an alleged breach of contract was deemed not
submitted to the arbitrators. *See Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512 (2d Cir.
1991)("We have consistently accorded the narrowest reading to section 10(d);" "Here, it is
uncontested that the ruling of the Arbitrators was confined to the issues presented by the
parties."); *PMA Capital Insurance Co. v. Platinum Underwriters Bermuda, Ltd.*, 659 F.Supp.2d
631, 635-36 (E.D. Pa. 2009)(arbitrators ruled that "any and all references to a 'deficit carry
forward" in the [2003 Agreement will be] removed from the contract;" held that arbitrators
exceeded their power when they "evidently found the Deficit Carry Forward Provision to be
more trouble than it was worth and simply eliminated it from the 2003 Agreement"); *Courier-
Citizen Co. v. Boston Electrotypers Union No. 11*, 702 F.2d 273, 275-276 (1st Cir.

12

1983)(submission agreement posed the question: "Did the Company violate the contract by placing Richard Grant in the laborer's job .... If so, what shall be the remedy?"; held that arbitrator exceeded power when back pay awarded to a third party employee); *Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.*, 607 F.2d 649, 650-651 (5th Cir. 1979)(in initial itemized statement of claim and "in brief submitted to the arbitration panel, [claimant] conceded that [damages for] charter hire was not an issue in the arbitration;" arbitrator post-hearing made *ex parte* call to respondent's counsel to determine charter hire damages and awarded charter hire damages; held that arbitrator exceeded powers).

TiVo's fifth case, *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597 (1960) is frequently cited for its colorful dictum that the "arbitrator is confined to interpretation and application of the . . . agreement; he does not sit to dispense his own brand of industrial justice." In that case, however, the Supreme Court actually upheld the arbitrator and remanded to allow the arbitrator to make amounts due employees definite, stating:

> the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Id.*, at 599.

Here, the Arbitration Panel, based on the evidence and legal argument presented, the structure and wording of the contract, and well established New York case law, interpreted the contract and determined that TiVo owed unpaid royalties to the Goldwassers. TiVo's contention that the Panel exceeded its authority by applying the implied covenant of good faith and fair dealing is entirely without merit.

**B. The Goldwassers (and the Arbitration Panel) Are Not Estopped from Referring to and Using the April 29, 2011 Settlement Agreement**

(Response to TiVo Brief, Part III.B, pp. 15-17.)

The Goldwassers do not dispute that in a letter to the Arbitration Panel, dated March 23, 2012 (Ex. F), the Goldwassers stated:

> TiVo's argument rests on one egregious misstatement about the Goldwassers' claim: that the "primary event that the Goldwassers claim gave rise to royalty obligations" is the April 29, 2011 settlement between TiVo and DISH/EchoStar. That is not correct. The events that give rise to the royalty claim are the August 17, 2006 and the June 6 [sic][2], 2009 orders by the District Court in TiVo's litigation against DISH/EchoStar.

TiVo, both during the arbitration hearing and in its brief to this Court, has distorted this statement.[10]

Underline_First, the statement when made in March 2012 (as well as through the close of the arbitration proceeding) is correct – the "primary event[s]" that give rise to TiVo's obligation to pay royalties to the Goldwassers are the orders of the District Court of Texas in the TiVo/EchoStar litigation, the substance of such orders subsequently being ratified and implemented by TiVo and EchoStar in their April 29, 2011 Settlement Agreement (the "Settlement Agreement").[11] Beginning with the Demand for Arbitration and continuing through the last brief submitted to the Arbitration Panel, the "primary event" that gives rise to the Goldwassers' claim for royalties has been the series of district court rulings in the EchoStar case,

---

[10] As discussed below under the third paragraph of this section, starting with Demand for Arbitration and continuing until TiVo submitted its expert witness report, "[t]he Goldwassers [sought] recovery based solely on events that occurred prior to March 12, 2012," *i.e.*, the various district court orders. *See* Goldwassers March 23, 2012 Letter to Panel (Ex. F).

[11] *See* Goldwassers' Brief in Support of their Motion to Confirm, pp. 10-17. *See also* Ex. C01 (timeline of TiVo/EchoStar Litigation); G. Prehg Brief, pp. 11-19 (Ex. S). Exhibits C02 – C18 are documents from the TiVo/EchoStar litigation, and Exhibit J086 is the TiVo/EchoStar April 29, 2011 Settlement Agreement.

not the Settlement Agreement, which ratified the decisions of the district court and quantified the infringement damages.[12]

    To put it differently, the district court rulings in the EchoStar litigation and their infringement findings are sufficient by themselves to support the Panel's award, and are the events that caused the Settlement Agreement to come into being. Without the initiation of litigation and the subsequent district court orders, there would have been no Settlement Agreement. Accordingly, it is entirely appropriate to characterize the district court orders as the events giving rise to the Goldwassers' damages claim.

    Moreover, the language of the Final Award emphasizes the role of the infringement findings against EchoStar made by the district court. The Award acknowledges TiVo's own position that, if the Panel were to award damages, such award logically could run only through the date of the 2006 jury verdict. Final Award, p. 5, first sentence (Ex. Q). The Award goes on to explain that the district court sanctioned EchoStar for continuing infringements after 2006 and, although there was no definitive legal ruling thereafter, the TiVo/EchoStar settlement allocated

---

[12] Demand for Arbitration, ¶ 48 (Ex. C) – district court orders in the EchoStar case are the basis for the Goldwassers' claim for royalties against TiVo.

G. Prehg. Brief, pp. 20 and 24-26 (Ex. S) – "EchoStar took a compulsory license, based on the jury verdict and the holdings of the District Court in the TiVo-EchoStar litigation, for all its DVR units during such period. In April 2011, when the litigation settled, TiVo and EchoStar ratified the holdings of the District Court;" extensive discussion of district court rulings.

G. Posthg. Brief, p. 5, n.3 (Ex. G) – Goldwassers rely on district court decisions as ratified by the Settlement Agreement, which supersedes the April 20, 2011 Federal Circuit decision.

G. Reply Brief, p. 15 (Ex. I) – Goldwassers entitled to royalties for term of PLA because of district court orders, as upheld in part by the Federal Circuit and ratified by the Settlement Agreement.

G. Sur-Reply Brief, p. 2-3 (Ex. L) – Setting forth basis for the Goldwassers' reliance on the Settlement Agreement and the TiVo/EchoStar litigation's dismissal with prejudice to establish that district court orders are ratified and upheld.

G. Supp. Brief, p. 12 (Ex. N) – "As a result of the district court orders and the dismissal with prejudice of TiVo's Complaint, EchoStar's use [of TiVo's patented technology] is authorized and TiVo does not have the right to prevent EchoStar from using the Barton Patent."

15

damages to this post-2006 time period, *id.*, thereby ratifying and upholding the district court's findings that EchoStar infringed TiVo's patent for the entire period. Thus, both the Goldwassers and the Arbitration Panel consistently relied on the litigation in the district court and that court's findings of infringement by EchoStar as a basis for the award.[13]

Second, TiVo included the April 29, 2011 Settlement Agreement between TiVo and EchoStar (Ex. J086) in the joint record provided to the Arbitration Panel, never objected to this document being entered into evidence, never objected when references were made to it during the course of the hearing, and never made any formal or informal request to preclude the Goldwassers from introducing evidence related to the Settlement Agreement.

Third, it is TiVo's change of position that caused the Goldwassers to have to repeatedly point out the role of the Settlement Agreement in ratifying and implementing the district court orders. The Goldwassers' Demand for Arbitration, filed on August 19, 2011, focuses on the finding of infringement made by the TiVo/EchoStar district court. *See* Demand for Arbitration, p. 18, ¶ 48:

> [T]he forced license of TiVo's patent for DVR Functionality to DISH/EchoStar occurred because TiVo sued DISH/EchoStar in 2004, obtained a final judgment against DISH/EchoStar for patent infringement in 2006 and obtained findings of on-going infringement in 2009.

The statement in the Goldwassers' March 23, 2012 letter to the Arbitration Panel is entirely consistent with their Demand for Arbitration.

In the Demand for Arbitration, as well as in the March 23, 2011 letter to the Panel, the Goldwassers had relied on TiVo's position that the Federal Circuit's April 20, 2011 *en banc*

---

[13] TiVo's assertion at p. 16 of it brief that the Panel "premised its Award on the EchoStar Settlement" is incorrect. The Panel, at page 3 (Ex. Q), refers to EchoStar being "compelled by litigation to pay revenue;" certainly, it was the series of district court orders that provided the necessary compulsion that resulted in EchoStar paying revenue to TiVo.

decision <u>affirmed</u> the district court's findings of infringement and award of sanctions. TiVo, in

its July 18, 2011 response to the Goldwassers' notice of breach stated:

> In the DISH litigation, TiVo received significant judgments and injunctive relief
> against DISH and EchoStar for infringement of the TiVo Patent a well as contempt
> sanctions for continued infringement in violation of the injunction. TiVo only
> reached settlement with DISH and EchoStar after an April 20, 2011 *en banc*
> decision of the U.S. Court of Appeals for the Federal Circuit, which <u>affirmed</u> the
> [district court's] **finding of contempt and award of sanctions** against DISH and
> EchoStar.

(Ex. J089, third para.)(emphasis added). TiVo's Answering Statement to the Demand for

Arbitration is to the same effect: After the district court found continuing infringements,

"EchoStar once again **appealed**, and the <u>Federal Circuit again affirmed the district court, first by</u>

<u>panel decision and most recently by an en banc decision issued on April 20, 2011</u>." (Ex. D, p.

11)(emphasis added); *id.*, p. 3 ("TiVo prevailed every step of the way")(cited in G. Prehg. Brief,

p. 29 (Ex. S)). Accordingly, the Goldwassers focused on the various district court orders giving

rise to TiVo's obligation to pay royalties to the Goldwassers, as TiVo agreed that the April 20,

2011 Federal Circuit decision affirmed and upheld the district court's ruling (thereby

precipitating EchoStar's acquiescence to a settlement).[14]

This changed in May 2012 when TiVo submitted its Expert Report and dramatically

altered its position. Now, for the first time, TiVo asserted that on April 20, 2011, the "Federal

Circuit <u>reversed</u> the district court's ruling that EchoStar's claimed software modification

infringed the [Barton] Patent." TiVo's Expert Report, p. 6, 7 (Ex. R024)(emphasis added).

Indeed, relying on the Federal Circuit's reversal of the district court's latest infringement and

---

[14] Given that, nine days after the Federal Circuit's April 20, 2011 decision, EchoStar paid TiVo $500
million to settle the dispute (including $175 million for infringements from late 2006 to April 29, 2011),
it is not surprising that both the Goldwassers and TiVo characterized the Federal Circuit's decision as
affirming the district court's infringement findings and sanctions against EchoStar. *See* G. Posthg. Brief,
pp. 10-11 and fn. 4 (Ex. G).

sanctions holdings, TiVo presented a damages calculation that stopped in 2006, instead of going through the end of the PLA's term, to March 12, 2011. *Id.*, p. 17.

Because of TiVo's change in position regarding the April 20, 2011 Federal Circuit decision – whereas TiVo earlier told the Panel that the decision affirmed certain district court findings, now TiVo had changed course 180 degrees and said that the appellate decision reversed the district court findings – the Goldwassers had no choice but to make the Settlement Agreement more prominent. The April 29, 2011 Settlement Agreement superseded and "trumped" the Federal Circuit decision, and had the practical effect of ratifying and upholding the various district court decisions. In their briefing, the Goldwassers fully explained to the Panel the relationship between the April 20 Federal Circuit decision and the April 29 Settlement Agreement, and how both relate to the district court orders. G. Posthg. Brief, p. 5, n.3 (Ex. G); G. Sur-Reply Brief, p. 2-3 (Ex. L). Under these circumstances, where TiVo's change of position necessitated the Goldwassers' referring to the Settlement Agreement, the Goldwassers have not "inequitably" adopted a position different from a prior position.

Fourth, TiVo cannot point to any prejudice resulting from reliance on the Goldwassers' statement. Indeed, there is no evidence that TiVo even relied on the statement. TiVo had ample opportunity after March 2012 to present its legal argument in multiple briefs, plus the right to introduce evidence at the hearing. It is not plausible that the statement, made in March 2012, caused TiVo to not assert legal arguments that it otherwise would have presented in its four posthearing briefs (after the Settlement Agreement was introduced and discussed at the hearing). And, it is inconceivable that the statement caused TiVo to not introduce evidence that it otherwise would have introduced, nor has TiVo identified any such evidence.

Fifth, none of the cases cited by TiVo suggest that a statement made in the context of opposing a request to file a summary judgment motion, when subsequently there is no reliance thereon by or prejudice to the opposing party and the opposing party then changes its own position, thereafter must bind the statement's maker. The cases speak to "disclaimers" via an executed settlement document (*Am. Ass'n of Bioanalysts*), via extensive argument as to the correct forum (*Maas*), or via the act of moving to compel arbitration (*Hartsdale*).[15] None of the cases speak to a "disclaimer" of a legal position made in briefing, especially when the other party's subsequent change of position makes the allegedly "disclaimed" statement relevant.

## C. The Award Does Not Contravene the PLA's Survival Provision

> (Response to TiVo Brief, Part III.B, last para., p. 16,
> and Part III.C.2.a, para. "First," pp. 18.)

TiVo argues that any award based on the TiVo/EchoStar litigation is contrary to the PLA's survival provision, which states that certain provisions "survive termination of this Agreement for any reason: . . . Section 4 [Payment] (with respect to payment obligations which arise prior to termination) . . . ." PLA, § 9.3 (Ex. A). The Panel's Final Award directly responded to TiVo's contention:

> Finally, the fact that TiVo and Dish/EchoStar finalized the settlement agreement subsequent to the PLA's termination did not extinguish TiVo's obligation to pay royalties for TV DVRs manufactured during the term of the PLA. Paragraph 9.3 of the PLA provides that payment obligations arising prior to termination survive the PLA. The payment obligation at issue here "arose" not when Dish/EchoStar

---

[15] *See Am. Ass'n of Bioanalysts v. New York Dept. of Health*, 75 A.D.3d 939, 947 (N.Y. App. Div. 2010)(in formal settlement of earlier action, defendant stipulated to indirect cost percentages for all federal grants; held that defendant bound by stipulation in prior settlement); *Maas v. Cornell University*, 253 A.D.2d 1, 5 ((N.Y. App. Div. 1999)(plaintiff employee, having "strenuously opposed conversion of this action" to a CPLR article 78 proceeding as requested by defendant Cornell, precluded from subsequently requesting conversion to article 78 proceeding); *Matter of Hartsdale Fire Dist. v. Eastland Constr., Inc.*, 65 A.D.3d 1345, 1346 (N.Y. App. Div. 2009)("petitioner's conduct in moving to compel arbitration . . . and preparing for arbitration, constituted misleading conduct which estopped the petitioner from raising [defense based on] the notice of claim requirement").

agreed to write the settlement check, but when it <u>manufactured</u> TV DVRs using DVR Functionality during the term of the PLA.

Final Award, p. 4 (Ex. Q)(emphasis added). In its briefing to the Panel, the Goldwassers emphasized the importance of the reference to "manufactured" in Section 1 of Attachment One. PLA (Ex. A). For example, in its Posthearing Reply Brief, the Goldwassers stated: "The key language governing the Goldwassers' entitlement to royalties under Attachment One, Section 1, is that third party DVRs be 'manufactured' during the term of the Goldwasser Patent." G. Reply Brief, p. 6 (Ex. I).

Moreover, from the Demand for Arbitration onward, the Goldwassers argued that TiVo's initiation of litigation and the district court orders in the TiVo/EchoStar litigation, not the Settlement Agreement, were the "primary events" under the PLA's royalty provision. *See supra*, pp. 14-15. The orders finding that EchoStar had infringed the Barton Patent and underlying TiVo's obligation to pay royalties to the Goldwassers were issued within the term of the PLA – between January 1, 2004 and March 12, 2011. Thus, as the Arbitration Panel concluded, it is entirely reasonable that TiVo's payment obligation arose when EchoStar "manufactured TV DVRs using DVR Functionality during the term of the PLA." Final Award, p. 4 (Ex. Q).

### D. The Goldwassers' Do Not Seek a Recovery Under Section 3, Attachment One, of the PLA

(Response to TiVo Brief, Part III.C.2.a, para. "Second," pp. 18-19.)

In the PLA, the Goldwassers granted TiVo the right to enforce the Goldwasser Patent. If TiVo asserted the Patent against an infringer, Section 3, Attachment One, of the PLA sets forth the allocation between TiVo and the Goldwassers of the damages or settlement amount. Section 3 addresses this and only this circumstance. Thus, the Panel correctly stated that "Claimants make no claim under the PLA's Net Litigation Recovery provisions, which would have yielded

40% of TiVo's net recovery from the $600 million received from Dish/EchoStar had TiVo

asserted the Goldwasser Patent in the litigation." Final Award, p. 2 (Ex. Q).

The Goldwassers never sought a percentage of TiVo's recovery from EchoStar as a result

of the TiVo/EchoStar litigation. A percentage recovery was available only under Section 3,

Attachment One, and that section did not apply because TiVo never asserted the Goldwasser

Patent against EchoStar. Instead, the Goldwassers always have contended that, under the terms

of the PLA's royalty provision, Section 1, Attachment One, as a consequence of the

TiVo/EchoStar litigation TiVo owes the Goldwassers a royalty. Again, the Goldwassers' and the

Panel's conclusion – that Section 3, Attachment One, is not relevant to the present dispute – is

reasonable. No rule of contract interpretation compels the conclusion, as asserted by TiVo, that if

litigation does not fall within the scope of Section 3 (because TiVo did not specifically assert the

Goldwasser Patent), then the litigation necessarily must be irrelevant for the purpose of the

royalty provision at Section 1, Attachment One. As the Panel explains, language in the PLA

directly contradicts TiVo's assertion: "the PLA's overarching purpose [is] to pay royalties to the

Goldwassers '. . . once whether from license revenue or litigation recovery'" Final Award, p. 8

(Ex. Q). The Panel's refusal to adopt TiVo's contract interpretation cannot be characterized as

irrational, exceeding the Panel's authority, or a manifest disregard of the law.

### E. As One of its Four Bases for its Award, the Arbitration Panel Used Traditional Gap-Filling Analysis to Provide an Essential Term of the Contract

(Response to TiVo Brief, Part III.C.2.b, p. 19.)

The Final Award states:

We find an obligation in the PLA to pay royalties under the circumstances where
an infringer is ultimately compelled by litigation to pay revenue that TiVo attempted to
obtain through a license. . . .

Additionally, this promise was ". . . encompassed within the implied
obligation . . . " of TiVo ". . . to exercise good faith . . ." and not to do " . . .

anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educational Testing Service, supra* at 390.

> Absent the implied obligation of good faith, [the Goldwassers'] entitlement to royalties would be subject to forces completely beyond their control, as there were no minimum royalty guarantees in the PLA. Such a result contravenes the parties' expressed intentions, i.e. to forge a "win-win" partnership in which [the Goldwassers] would share TiVo's growth whether by licensing or litigation, as testified to by [TiVo]. Moreover, it would have the effect of preventing [the Goldwassers] from receiving the benefits of their bargain in exchange for TiVo's exclusive rights in their patent, an outcome disfavored under New York law. *See, e.g., Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79 (1933); *Wood v. Duff-Gordon*, 222 N.Y. 88 (1917).

Final Award, p. 3-4 (Ex. Q). TiVo objects, arguing that the Panel has provided an unessential

term of the contract, which TiVo contends is prohibited under New York law.

The Arbitration Panel found that a critical, fundamental and "essential" term of the

contract is missing – whether TiVo is obligated under the PLA "to pay royalties under the

circumstances where an infringer is ultimately compelled by litigation to pay revenue that TiVo

attempted to obtain through a license." *See id*. The term for compensation of a licensor in a

license agreement is as essential as the price term in a contract for sales of goods. *See* TiVo's

Brief, at 19 ("[e]ssential terms are usually limited to price, quantity, and time" (citation

omitted)). First, the missing term in the PLA is equivalent to the price term in a sales contract –

an essential term necessary to establish the consideration for the transaction. Second, lack of an

agreed-to price term for one sales transaction does not make that price term unessential simply

because price terms for other transactions are provided; by analogy, lack of a royalty term for

one transaction in a license agreement does not make that royalty term unessential because other

royalty terms are provided for other transactions. Accordingly, the Goldwassers submit that the

missing term is essential, and was appropriately filled by the Arbitration Panel by applying the

implied covenant of good faith and fair dealing.

22

**F. The Panel's Final Award Does Not Result in a "Commercially Absurd Result"**

(Response to TiVo Brief, Part III.C.2.b, p. 19-20.)

As set forth in the Goldwassers' Memorandum of Law in Support of their Motion to

Confirm, at pp. 5-10 and in briefing during the arbitration proceeding,[16] which is incorporated by

reference herein, the Goldwassers have described "the bargain struck" by TiVo and the

Goldwassers on the eve of TiVo's filing patent infringement litigation against EchoStar. The

Goldwassers' final brief concisely explained the reasonableness of the "bargain struck":

> Instead of relying on contract provisions that would mandate conduct, guarantee
> minimums or provide performance-based termination rights, the Goldwassers
> relied on TiVo's self-interest to diligently and in good faith implement its well-
> established business model and thereby generate royalties under Section 1 of
> Attachment One. Whether styled as a "win-win" situation, as "aligned interests,"
> or as the Goldwassers "piggybacking" on TiVo's business model, the parties'
> intent was that (i) the contract would not expressly mandate that TiVo generate
> revenue by either licensing, or pursuing infringement litigation regarding, the
> Goldwasser Patent, and (ii) instead, if TiVo benefitted from use of "DVR
> Functionality" (either its own use or use by third parties), then the Goldwassers
> likewise would benefit, albeit to a very modest extent.

G. Supp. Brief, p. 2 (Ex. N). TiVo retained complete flexibility as to how to run its

business and maximize the value of its DVR technology, the Goldwassers gave up all

rights to their pioneer DVR patent and asserted no control over TiVo's use of the

Goldwasser Patent, and, in return, TiVo promised the Goldwassers a very modest royalty

███████████████████████████████████████████

████████ when TiVo licensed its DVR technology (or, using the PLA's terminology,

upon "DVR Functionality licensed from TiVo," (Ex. A)).

Thus, it is entirely reasonable that the TiVo/EchoStar litigation result in royalty payments

to the Goldwassers. Beginning as early as 1997-1998, TiVo sought to generate revenue from its

---

[16] Demand for Arbitration, pp. 6-8 (Ex. C); G. Prehg. Brief, pp. 10-11 (Ex. S); G. Posthg. Brief, pp. 1-6 (Ex. G); G. Reply Brief, pp. 1-2 (Ex. I); and G. Supp. Brief, pp. 1-4 (Ex. N).

DVR technology that EchoStar was using, and over the course of the next five years TiVo diligently pursued a formal license agreement with EchoStar. EchoStar, however, refused to enter into an express license agreement. *See* Final Award, p. 2 (Ex. Q); G. Prehg. Brief, p. 13 (Ex. S); Michael Ramsey Testimony in TiVo/EchoStar Case, pp. 101, 104 (Ex. C04). TiVo, immediately after locking up exclusive rights to the Goldwasser Patent in the March 12, 2004 PLA, sued EchoStar for infringement of TiVo's DVR technology, specifically, the Barton Patent, and pursued that litigation to a successful resolution. *See* Final Award, p. 2 (Ex. Q) Under these circumstances – where TiVo attempted to generate revenue through a license, where EchoStar refused to enter into a formal license but used TiVo's DVR technology, and where TiVo sued EchoStar and was paid substantial revenue attributable to EchoStar's use of TiVo's DVR technology – the Panel's Final Award reasonably concluded that the PLA obligates TiVo to pay a royalty to the Goldwassers for each EchoStar TV DVR unit manufactured during the period the PLA was in effect. *See id.*, pp. 2 and 3.

### G. TiVo's Argument and Case Law Regarding Patent Licenses and Patent Litigation Is Inapposite

(Response to TiVo Brief, Part IV.B.1, pp. 21-23.)

TiVo conflates two distinct concepts: the act of infringing and the outcome of litigation where the infringer pays damages. The Goldwassers do not dispute that the mere act of infringing does not create a license for purposes of the PLA. Rather, it is the initiation of the litigation and the district court orders, as ratified and implemented by the Settlement Agreement, that, under the circumstances here, create a license – as the Goldwassers put it in their briefing to the Panel, an implied license in the nature of a compulsory license.

The Goldwassers refer the Court to Claimants' Supplementary Brief Requested by Panel (Ex. N), which at page 12 sets forth a chart comparing the "Key Elements of a Commercial

24

License Transaction" and the "Corresponding Elements Arising as a Result of the TiVo/EchoStar Litigation." The key comparison is the last bullet: In a typical commercial license transaction, "User [is] authorized to use the property; owner/holder does not have the right to halt use of the property;" the corresponding element arising as a result of the TiVo/EchoStar litigation is essentially the same – "As a result of the district court orders and the dismissal with prejudice of TiVo's Complaint, EchoStar's use is authorized and TiVo does not have the right to prevent EchoStar from using the Barton Patent." Notwithstanding this explanation, TiVo continues to focus on the act of infringement, not the result of patent infringement litigation.

A case relied upon by TiVo – *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995), illustrates the fallacy in TiVo's reasoning. *Carborundum* stands for the unexceptional proposition that a patent license is an affirmative defense to patent infringement. Thus, if in 2003 TiVo had granted EchoStar a license to use the Barton Patent, then that license would be an affirmative defense to a claim by TiVo for infringement of that patent. Similarly, the sequence of events and result of the EchoStar litigation – complaint filed for infringement of the Barton Patent, district court orders issued, appeals had, and, finally, dismissal with prejudice – also is an affirmative defense to a claim against EchoStar, brought by TiVo after the conclusion of such litigation, for infringement of the Barton Patent.

TiVo also relies on three cases establishing that a patent license agreement is basically a promise by the licensor not to sue the licensee for infringement. *Spindelfabril Suessen-Schurr, Stahledker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987); *see also Transcore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275-76 (Fed. Cir. 2009)("a non-exclusive patent license is equivalent to a covenant not to sue"); *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 242 (1927)(patent

license "has been described as a mere waiver of the right to sue by the patentee"). TiVo, however, ignores that the result of the EchoStar litigation also can be characterized as a promise by TiVo henceforth not to sue EchoStar for infringement of the Barton Patent. Obviously, principles of res judicata and collateral estoppel prevent TiVo, having dismissed with prejudice its lawsuit against EchoStar, from now suing EchoStar for infringement of the Barton Patent with respect to infringements during any period of the Patent's term.

The cases TiVo cites for the proposition that patent infringement damages or settlement amounts are not the equivalent of royalties are inapposite. First, the Final Award makes clear that the issue before the Panel is the application of a particular fact situation to a particular contract. Final Award, p. 3 (Ex. Q)("We find an obligation in the PLA to pay royalties under the circumstances where . . ."). Second, the Panel relies on the express language of the PLA:

> It is the parties' intention that this Section 1(a) be interpreted in a manner that causes TiVo (on behalf of itself and its licensees and sublicensees) to pay Royalties at the rate set forth above once, whether from license revenue or litigation recovery (but not more than once) per DVR unit.

Final Award, p. 2 (Ex. Q) (citing PLA, § 1.a of Attachment One, p. 9 (Ex. A)(emphasis added). This provision clearly states that "Royalties," a term defined in the introductory paragraph of such Section 1, can result from either TiVo's licensing activities or from TiVo's litigation efforts against infringers of its DVR technology. TiVo's position, seeking to read this sentence out of the PLA, is untenable. Third, as set forth in the footnote below, each of the cases cited by TiVo are inapplicable.[17] In particular, the two cases involving most favored licensee contract

---

[17] Contrary to TiVo's assertion, no "well-defined, explicit, and clearly applicable" governing law addresses "reasonable royalties" in litigation and "license" and "royalty" provisions in a contract.

*Rude v. Westcott*, 130 U.S. 152, 165 (1889) – No discussion of relationship between award of "reasonable royalties" in litigation and the "license" and "royalty" provisions in a contract.

*Info. Res., Inc. v. Test Mktg. Grp., Inc.*, 22 F.3d 1102 (Fed. Cir. 1993) – The phrase "Homarket sells, licenses, leases or in any other way disposes of the Licensed Device" does not encompass suing for

provisions (*Raytheon* and *Wang*), do not purport to establish universal rules that govern all instances of the use of the term "royalty" in every contract. Accordingly, the Panel's decision that these cases did not govern the specific contract terms and circumstances in the present dispute, especially in light of the PLA's characterization of royalties in Section 1(a), cannot be characterized, under either New York law or the FAA, as irrational, exceeding the Panel's authority, or manifest disregard for the law.[18]

---

infringement and collecting damages in part because "[t]here is nothing in the agreement that suggests the parties contemplated such infringement litigation . . . [there is] no mention of infringement litigation." In distinct contrast, Section 1(a) of the PLA, as explained above, specifically states that the term "Royalties" can result from a litigation recovery.

*Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988) – No discussion of relationship between award of "reasonable royalties" in litigation and the "license" and "royalty" provisions in a contract.

*Wang Labs, Inc. v. Oki Elec. Indus. Co.*, 15 F.Supp. 2d 166, 171 (D. Mass. 1998) – For purposes of plaintiffs most favored licensee clause, defendant's settlement for past infringement deemed not to be royalties <u>in part because "of the language of the contract;"</u> extensive discussion of policy issues underlying general rule that <u>for purposes of most favored licensee clauses,</u> litigation damages and settlement amounts deemed not to be royalties. As the Panel's Final Award states, "[g]iven its context, even if the ruling were from a New York court, it is inapposite here." Final Award, p. 3 (Ex. Q).

*Raytheon Mfg. Co. v. Radio Corp. of Am.*, 286 Mass. 84, 93-94 (Mass. 1934) – Plaintiffs, the beneficiaries of a most favored licensee clause in a license agreement, "were entitled to a reduction in royalties only if the defendant granted 'another license' <u>and the plaintiffs accepted all the other conditions imposed in such other license.</u> These terms are compatible with an express license alone and are irrelevant to damages paid for infringement." (Emphasis added.) Thus, in part based on the terms of that specific most favored licensee contract provision, infringement damages could not constitute royalties.

[18] TiVo, at p. 23 of its brief, also relies on *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1467 (Fed. Cir. 1998), for the proposition that a license "only operates prospectively." This certainly is not a rule of law universally accepted. *See Shatterproof Glass Corp. v. Libbey-Owens-Ford Co.*, 482 F.2d 317, 321 (6th Cir.1973), *cert. denied*, 415 U.S. 918 (1974) (release from claims of past infringement had the effect of a <u>retroactive license;</u> relying on *De Forest Radio Telephone Co. v. United States*, 273 U.S. 236 (1927), for the proposition that a release can constitute a <u>retroactive license).</u>

### H. The Arbitration Panel Properly Held that Revenue that TiVo Received from EchoStar via the Patent Infringement Litigation Was the Functional Equivalent of Revenue from a Licensing Arrangement

(Response to TiVo Brief, Part IV.B.2, pp. 23-24.)

As one of its four bases for awarding damages, the Arbitration Panel relied on the

functional equivalence of litigation revenue and licensing revenue under the circumstances of the

TiVo/EchoStar litigation. The Final Award sets forth the Panel's reasoning:

> For the purpose of determining the Goldwassers' right to royalties under the PLA, the majority is persuaded that a portion of the money TiVo received from Dish/EchoStar via litigation was the functional equivalent of revenue that TiVo would have earned from the licensing arrangement it sought with Dish/EchoStar, which concededly would have resulted in royalties to the Goldwassers. [footnote omitted]
>
> In arguing the PLA's inapplicability to the revenue received from Dish/EchoStar, TiVo contends that there is a fundamental distinction between a license to Dish/EchoStar (i.e., permissive use of TiVo's technology) and Dish/EchoStar's infringement (i.e. unauthorized use). However, notwithstanding the relevance of that distinction in various patent litigation contexts, it is not dispositive in determining TiVo's royalty obligations under the PLA.
>
> Indeed, the intertwining between licensing and infringement is illustrated by the use of a "hypothetical royalty" analysis in patent infringement litigation (including the TiVo-Dish/EchoStar litigation), i.e., calculation of the royalties that an infringer would have owed had there been an express license, as a framework for determining the damages payable for infringement.

Final Award, p. 3 (Ex. Q). TiVo, both before the Panel and here, simply has ignored the clear

import of numerous cases that support the reasoning set forth in the Final Award.

TiVo asserts that, in the Goldwassers' briefing, "[n]ot a single case was cited supporting

the position that payment of damages was tantamount to a license." TiVo Brief, at 24. This is

simply not true. Case law that the Goldwassers submitted to the Panel consistently equates the

patent litigation defendant with a licensee who unilaterally takes and uses the patent holder's

intellectual property. Often, the courts characterize an award of a reasonable royalty as a

"compulsory license," making clear, as does the Panel's Final Award, the functional equivalence

28

between revenues derived from an infringer and licensing revenue. For example, in *Oracle America, Inc. v. Google Inc.*, No. C 10-03561 WHA (N.D. Cal. Jan. 9, 2012), the court expressly recognizes that in patent litigation the infringer is required to "pay for a license," which the court calls a "compulsory license." *Id.*, at 9. The *Oracle* court stated:

> The July 22 order stated that a claim-by-claim analysis of damages was needed: "determining the date of first infringement requires a claim-by-claim analysis" (Dkt. No. 230 at 7). There are a number of reasons. First, a single patent can include many distinct variations of an invention, each represented by its own claim. Some may be apparatus claims. Some may be method claims. A single patent may include many apparatus claims, again each represented by its own claim. The same is true for methods. An infringer of one claim is compelled by law to pay for a license, via the hypothetical negotiation, for the specific invention represented by that claim but it is not required to pay for a license for the other specific inventions not infringed. Therefore, the hypothetical negotiation must be focused only on negotiating a compulsory license for each claim infringed, not for the entire patent.

*Id.* (emphasis added). The *Oracle* court could not be more clear: "An infringer of one claim is compelled by law to pay for a license." *Id.* (emphasis added).

Other court cases conduct the same analysis, use the same terminology and reach the same conclusion. *See Ball Aerosol and Specialty Container, Inc. v. Limited Brands, Inc.*, 514 F. Supp.2d 1051, 1065 (N.D. Ill. 2007)(plaintiff seeks higher royalty rate "to fairly compensate [plaintiff] for the imposition of a compulsory license on the patented invention"); *Commonwealth Scientific and Industrial Research Organisation v. Buffalo Technology Inc.*, 492 F.Supp.2d 600, 605 (E.D. Tex. 2007)(defendant argues that absence of injunction means "a compulsory license would force [defendant] to pay [plaintiff] licensing royalties.").[19]

---

[19] Commentators also have characterized patent infringement, absent an injunction, as a compulsory license. Gwartney, Troy L., *Harmonizing the Exclusionary Rights of Patents with Compulsory Licensing*, 50 Wm. & Mary L.Rev. 1395, 1401 (2009) http://scholarship.law.wm.edu/wmlr/vol50/iss4/12; ("when a court fails to grant a permanent injunction despite infringement, a compulsory license is created"). Although this Note argues for a novel scheme of mandatory licensing for a portion of a patent's term, its analysis and characterization of the period of infringement as a compulsory license is unexceptional.

Case law appearing to challenge the existence of a compulsory license does <u>not</u> suggest that the infringer has not taken a form of a forced or compulsory license; instead, the case law teaches that compensatory damages paid to the injured party under the Patent Act, Section 284, may <u>exceed</u> the royalty for the compulsory license. For example, in *Ball Aerosol*, 514 F.Supp.2d at 1065, the court explained that a "compulsory license will not adequately compensate [plaintiff] for [defendant's] continued intentional infringement." The court did not state that a compulsory license did not exist; rather, the court explained that the damages methodology should allow for damages greater than a reasonable royalty. *See also Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1328 (Fed. Cir. 1987); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 216 F.Supp. 3d 1175, 1182-83 (D. Colo. 2002).

The absence of an injunction means the existence of a compulsory license (and the award of damages that are the functional equivalent of royalties) – always the case retrospectively with respect to past infringements, and prospectively with respect to future infringements that are not enjoined. This analysis, exemplified by the *Oracle* decision's statement that an "infringer of one claim is compelled by law to pay for a license," is well accepted and provides a valid, reasoned basis for the Panel's Final Award.

Furthermore, the district court in the EchoStar litigation expressly and repeatedly equated infringement damages to a reasonable royalty in a licensing transaction. When TiVo sued EchoStar for taking TiVo's intellectual property protected by a patent, TiVo, in accordance with the Patent Act, 35 U.S.C. § 284, succeeded in recovering a reasonable royalty. The reasonable royalty can be based on an established royalty or hypothetical negotiations between the parties, and the "hypothetical negotiation requires the court to envision the terms of a licensing agreement reached as a result of a supposed meeting between the patentee and the infringer at the

30

time infringement began."[20] *See Rite-Hite Corporation v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).

TiVo and its expert witness in the EchoStar litigation, Dr. Ugone, used the reasonable royalty methodology to calculate a royalty amount with respect to the EchoStar DVRs that used TiVo's patented invention. Ugone Testimony, April 4, 2006, pp. 74, 77-78 (Ex. C5)("I calculated what's called a reasonable royalty or royalty damage;" applied the fifteen *Georgia Pacific* factors). Dr. Ugone's testimony made clear that he, on behalf of TiVo, was determining the royalties due for a license of TiVo's Barton Patent:

- "Factor 1 calls for royalties received by TiVo for the <u>licensing</u> of the [TiVo Patent] proving or tending to prove an established royalty." *Id.*, p. 78.

- Discussion of similarities to the "<u>licensing arrangement</u> between TiVo and DirectTV" *Id.*, p. 81.

- "Basically, what we're trying to figure out for the reasonable royalty is, how much should EchoStar pay in order to use TiVo's technology to be able to offer the DVR capability. *Id.*, p. 85.

- Review of TiVo's "<u>licensing policy.</u>" *Id.*, p. 88.

- "So after the hypothetical negotiation, I have come to the <u>royalty rate</u> of $1.25 per subscriber per month" *Id.*, p. 9.

Emphasis added.

The Arbitration Panel was also aware that in the TiVo-EchoStar litigation, not only TiVo and its expert witness, but also the jury instructions and the jury verdict form adopted the standard royalty calculation based on an implied license in the nature of a "compulsory

---

[20] The leading case providing guidance as to how to determine "reasonable royalty" is *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The case enumerates fifteen factors that should be taken into account when determining a "reasonable royalty." *See Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*, 514 F. Supp.2d 1051, 1060-65 (applying *Georgia-Pacific* factors).

license."[21] In addition, the Court's June 2, 2009 Order regarding damages confirms that the award was premised on there being a compulsory license. *TiVo Inc. v. DISH Network Corp.*, No. 2:04-CV-01 (DF) (E.D. Tex. June 2, 2009)(Ex. C17). The District Court explained that "a reasonable royalty rather than a lost profit analysis is more appropriate for this case. . . . Instead [of a lost profit analysis], this Court finds it more appropriate to assume that the parties negotiated for a <u>license</u> covering the twenty-month stay period." *Id.*, at 5 (emphasis added).

Moreover, on September 4, 2009, the District Court, in an Order assessing sanctions against EchoStar, stated that "a sanction equal to the jury rate would be <u>indistinguishable from a compulsory license</u> . . ." *TiVo Inc. v. DISH Network Corp.*, No. 2:04-CV-01 (DF) (E.D. Tex. September 4, 2009), at 5-6 (Ex. C18)(emphasis added). The Court was not denying that EchoStar had taken a license to TiVo's Patent; rather, the Court was emphasizing that the contempt damages must be greater than the reasonable royalty for the compulsory license taken by EchoStar. Ultimately, the Court awarded $1.25 per subscribe per month as a reasonable royalty "to compensate TiVo for EchoStar's continued infringement," plus "an additional $1.00 sanction to promote EchoStar's compliance with this Court's orders." *Id.*, at 7.

## IV. UNDER NEW YORK LAW, THE ARBITRATION PANEL CAN TAKE INTO ACCOUNT EQUITABLE CONSIDERATIONS

The Panel's Final Award, under New York law, is not totally irrational, and, under the FAA, does not exceed the Panel's power or manifestly disregard the law. Rather, the Final Award fully accords with well accepted case law and rules of contract interpretation. In any case, under the applicable New York law, even if the Panel's Award reflected the spirit rather than the letter of the agreement after the Panel applied its own sense of law and equity to the facts, TiVo's Motion to Vacate must be denied.

---

[21] G. Prehg. Brief, pp. 14-15 (Ex. S)(discussion of TiVo/EchoStar jury instructions and jury verdict form).

Under New York law, an arbitrator "may do justice as he sees it, applying his own sense of law and equity to the facts as he finds them to be and making an award reflecting the spirit rather than the letter of the agreement . . . [citations omitted]." *Silverman v. Benmor Coats, Inc.*, 61 N.Y.2d 299, 308 (1984)(cited in *County of Nassau*, 402 F. App'x 540). "Arbitrators are not bound by principles of substantive law or legal procedure, *County of Nassau*, 402 F. App'x 540. (2d Cir. 2010). Rather:

> once it is clear that a valid agreement to arbitrate has been made and complied with and that the claim sought to be arbitrated is not barred by limitations, the authority of the arbitrator is plenary . . . [and the arbitrator] may do justice as [the arbitrator] sees it.

*Glauber v. Glauber*, 600 N.Y.S.2d 740, 743 (N.Y.A.D. 2 Dept. 1993) (citing *Silverman v. Benmor Coats*).

Indeed, during the final negotiations leading up to execution of the PLA, TiVo's General Counsel, Matthew Zinn, stated: "It might be that we've waded too far into the trees in trying to address all possible scenarios and we've [sic] just need to take a few steps back and place more reliance on the interpretation and <u>arbitration safety valves</u>." Zinn Email to Goldwassers, dated March 1, 2004 (Ex. J031)(emphasis added). Again, five days later, Mr. Zinn reiterated this point:

> Remember that there's <u>a safety value [sic][valve] underlying all of this stuff -- if the Goldwassers don't feel that a particular settlement is fair and reasonable, then an arbitrator will make that decision</u>. Accordingly, let's not let ourselves get too wrapped up in trying to nail every possible settlement scenario. We're [sic] made great progress in reaching agreement on all other aspects of this license agreement.

Zinn Email to Goldwassers, dated March 6, 2004 (Ex. J037)(emphasis added). Mr. Zinn's comments to the Goldwassers were uncannily consistent with the New York law governing arbitration awards.

33

## V. CONCLUSION

For the reasons set forth herein, under New York law TiVo's motion to vacate must be denied. The Arbitration Panel's Final Award neither "violates a strong public policy, is irrational [nor] clearly exceeds a specifically enumerated limitation on the arbitrator's power." *County of Nassau*, 402 F. App'x 540; *N.Y.C. Transit Auth.*, at 336; *Silverman,* at 61. Moreover, TiVo's motion also should be denied under the FAA because TiVo has not met the federal standards to vacate an arbitration award – the Panel neither refused to hear evidence, exceeded their powers, nor manifestly disregarded the law. And, lastly, TiVo's Motion to Vacate must be denied under the standards set forth, under New York law, in *Silverman*, 61 N.Y.2d, at 308, and *County of Nassau*, 402 F. App'x 540.

Dated:  October 12, 2012

_Gary Hoppe_
Gary Hoppe
KANTOR, DAVIDOFF, WOLFE, BANDELIER,
  TWOMEY & GALLANTY, P.C.
51 East 42nd Street, 17th Floor
New York, New York  10017
Telephone:  (212) 682-8383
Facsimile: (212) 949-5206
Email address:  hoppe@kantorlawonline.com

Tobey B. Marzouk
Thomas M. Parry
MARZOUK & PARRY, PLLC
1901 Pennsylvania Avenue, NW, Suite 607
Washington, DC  20006
Telephone: (202) 463-7293
Facsimile:  (202) 955-9271
Email address:  tmarzouk@mptechlaw.com
Email address:  tparry@mptechlaw.com

Counsel for Respondents

34